JOHN KEMP et al., Respondents, *v.* THE KNICKERBOCKER ICE COMPANY, Appellant.

In February, 1864, defendant, a wholesale dealer in ice, entered into a contract with plaintiffs, retail dealers in New York city, by which it agreed to deliver to them 2,000 tons of ice annually for nine years, at $2 per ton, to be delivered daily, Sundays excepted. In October, 1869, the parties entered into another contract by which defendant agreed to deliver 2,000 tons annually for three years, at $2.50 per ton. Both contracts provided that in case of the inability of defendant "to lay up a full supply of ice," it was bound only to deliver such proportion of the amount contracted for "as the quantity of ice laid up be to the full supply." At the time the contracts were made, defendant had ice houses along the Hudson river and at Rockland Lake. These points were the usual sources of supply for the New York market. Defendant's

Statement of case.

houses were increased in number and capacity from year to year to meet the demands of its trade. In ordinary seasons, all could be filled. In 1870 the winter was mild, and the supply of ice short; defendant did not deliver under the contracts the amounts specified therein. In an action for breach of the contracts, *held*, that the words "full supply" in the contracts had reference to the capacity of defendant's ice houses; that defendant was not absolutely bound to lay up a full supply, but was only bound to use reasonable and practical means so to do, according to the usage of the trade.

Defendant cut and stored in its ice houses in the ordinary way, in 1870, about 147,064 tons of new ice; it had of old ice carried over, of ice procured from ponds near the Hudson and stored in its houses on that river, and of ice stacked at various points along the river, in all 54,136 tons; it had also a quantity stacked, and it purchased during the season large quantities, at distant points, at great expense, thus procuring sufficient to fill all its contracts. *Held*, the old ice, the ice procured near the river, and that stacked on its borders, could properly be considered as "laid up" within the meaning of the contracts, and that plaintiffs were entitled to a proportionate share thereof, as well as of new ice cut and stored in the ordinary way; but that they were not entitled to any portion procured at unusual and distant places.

Plaintiffs were entitled, under the contracts as above construed, to 1,609.60 tons; defendant delivered only 1,174 tons, representing that it had measured its ice and that plaintiffs were only entitled to that amount. Plaintiffs, relying upon such representation, signed writings agreeing to accept the amount delivered as their proportion. The complaint asked to have these agreements set aside as procured by fraud, and the courts below set them aside on that ground. *Held*, that although the evidence failed to sustain the allegations of fraud, yet as the agreements were either the result of fraud or mistake, the judgment would not be disturbed.

The contracts contained a clause by which plaintiffs agreed to pay one dollar per ton for each ton they failed to take under the contracts, and defendant agreed to forfeit the same sum for each ton it failed to deliver. The second contract also provided that if plaintiffs should in any year need any further quantity of ice than that contracted for, they should purchase it of defendant at the price it was selling to others who had no contracts. After receiving the 1,174 tons as above stated, plaintiffs purchased of defendant 1,180 tons of ice, for which they paid the market price. *Held*, that the sum specified in the contracts was intended to limit the extent of damages in case of breach; but *held* (EARL, J., dissenting), that as either by mistake or fraud plaintiffs had been induced to take and pay for at the market price, under the clause in the last contract, the 435.60 tons to which they were entitled at the contract price, they were entitled to recover back the difference between what they paid and the contract price.

(Argued February 8, 1877; decided March 20, 1877.

APPEAL from judgment of the General Term of the court of Common Pleas of the city and county of New York modifying, and affirming as modified, a judgment entered upon a decision of the court on trial at Special Term.

This action was brought to recover damages for the alleged breach of two contracts between the parties.

The first contract was executed February 25th, 1864, by which defendant agreed to sell and deliver to plaintiffs 2,000 tons of ice per annum for nine years, the same to be delivered daily at such depot or depots in the city of New York as plaintiffs might designate, the ice to be sold by plaintiffs in their retail trade at such price or prices as defendant might establish from year to year. The contract contained these clauses:

" It is, however, provided and so understood by the parties to this agreement, that in case of the inability of the parties of the first part to lay up a full supply of ice, or other casualties, then and in that case the parties of the first part are bound only to deliver and supply to the parties of the second part such proportion of the above amount, two thousand tons of ice, during such year, as the quantity of ice laid up be to their full supply.

" The parties of the second part agree to take of the parties of the first part the amount of ice above named, and by these presents bind themselves, their heirs and assigns, to receive the above-named eighteen thousand tons of ice, as above conditioned, and to pay for each and every ton two dollars, in weekly and full payments, after the proper delivery of the same by the parties of the first part, according to the meaning and letter of this agreement.

"And the parties of the second part hereby agree to pay to the parties of the first part one dollar per ton for each and every ton that they fail to take, according to the terms of this agreement; and the parties of the first part also agree to forfeit one dollar per ton for each and every ton that they fail to deliver, according to the terms of this agreement."

The second contract was executed October 25th, 1869; by

it defendant agreed to sell and deliver to plaintiffs 2,000 tons of ice during each of the years 1870, 1871 and 1872, and 4,000 tons during the years 1873 and 1874, at $2.50 per ton. The other provisions of the contract were similar to those in the first, with this additional provision:

" And if the parties of the second part should need any further quantity of ice during each and every year, they shall take it from the parties of the first part, and pay therefor the same price per ton as the parties of the first part may then be charging to persons having no contract."

The complaint alleged in substance, that on or about May 25th, 1870, defendant represented that it had been unable to lay up a full supply of ice for that year, and so could not deliver the quantity specified in the contracts; that plaintiffs' proportion, to which it was entitled, of that laid up was 587 tons, under each contract; that plaintiffs, believing such representations, signed agreements indorsed on each contract, agreeing to accept that quantity as the full amount to which they were entitled; that such representations were false and fraudulently made, with intent to deceive ; that defendant had, in fact, laid up a full supply.   Plaintiffs asked judgment adjudging said agreements of May, 1870, null and void, and for damages.   Defendant, at the time of the making of said contracts, was a wholesale dealer in ice, having ice-houses along the Hudson and at Rockland Lake, which points were the usual sources of supply for the New York market, and from year to year, as its business increased, it had increased the number and capacity of its ice-houses, and they had a storage capacity in 1870 of 500,000 tons.   Defendant, in 1870, gathered and stored in its own ice-houses, on the Hudson river and Rockland lake, 147,064 tons of new ice.   It had also old ice in the same ice-houses, and in barges, 18,088 tons; of new pond ice, obtained from ponds a few miles distant from the Hudson river, transported to and  stored in its houses on said river, 25,548 tons; also ice gathered and stored in stacks at various points on the Hudson river, and elsewhere, 10,500 tons;  it had also ice gathered and stored in Saratoga

county and in the Adirondack region, on joint account with and in the name of the Washington Ice Company, between 60,000 and 70,000 tons, of which the defendant was entitled to two-thirds; and also certain other large quantities of ice, transported from Massachusetts, Maine, and other distant points, secured by purchase from other parties, for use as a part of its supply for the year 1870. The court found that defendant made the representations stated in the complaint, as to its supply in 1870; that it had measured the ice it had, and that twenty-nine and thirty-five one-hundreths per cent of the 2,000 tons stipulated to be delivered, or 587 tons under each contract, was the full and fair proportion which the plaintiffs were entitled to receive. Believing and relying upon this representation, and without knowledge to the contrary, the plaintiffs were induced to execute the indorsements on the contracts, and that such representations were false and fraudulent.

Plaintiffs purchased of defendant, after receiving and paying for the quantity so delivered under the contracts, 1,180 tons of ice, paying therefor the same prices as defendant was charging other parties who had no contract, i. e., from thirteen dollars to sixteen dollars per ton.

The court further found that defendant was able to lay up, and did lay up, a full supply of ice for 1870, within the meaning of the contracts, and, as conclusions of law, that the receipts or indorsements on the contracts of May, 1870, were void; that plaintiffs were entitled to the full quantity called for by the contracts; that for the 1,180 tons sold at the market price, plaintiffs were entitled to recover back the sums paid therefor in excess of the contract prices, and that after deducting this quantity and the quantity delivered under the contracts, for the balance to make up the 4,000 tons, plaintiffs were entitled to the difference between the contract prices and the prices for which plaintiffs could have sold the same according to the prices fixed by defendant. A reference was directed to fix the amount of damages according to such findings, and upon the coming in of the report, judgment was perfected in accordance therewith.

The General Term held that plaintiffs were only entitled to the difference between the contract prices and the market prices, upon the balance of the 4,000 tons, after deducting the amount delivered under the contracts, and the amount purchased, and directed a reduction of the judgment to the amount so ascertained.

Further facts appear in the opinion.

*S. P. Nash*, for the appellant.    The ice defendant had been able to cut and lay up in the usual manner from the usual sources of supply in ordinary seasons, was the ice that was to be measured under the contract.    (*D. L. & W. R. R. Co.* v. *Bowen*, 58 N. Y., 573.)    The evidence to show a fraudulent purpose on the part of defendant was irrelevant, as it did not relate to any transaction between defendant and plaintiffs.    (*First National Bank of Lyons* v. *Ocean National Bank*, 60 N. Y., 278, 296–7 ; *Starr* v. *Bennett*, 5 Hill, 303, Blackhorn's case, 8 D. M. & G., 177 ; *Rashdale* v. *Fora*, L. R. [2 Eq.] 750.)    Evidence of defendant's arrangements with other dealers was also improper.    (*Cary* v. *Hotaling*, 1 Hill 311 ; *Hall* v. *Taylor*, 18 N. Y., 588.)    The court below erred in depriving defendant of the benefit of the clause in the contract which liquidated the damages at one dollar per ton.    (*Lea* v. *Whitaker*, L. R. [8 C. P.] 70 ; *Sparrow* v. *Paris*, 7 H. & N., 594 ; *Knapp* v. *Maltby*, 13 Wend. 587 ; 2 Story's Eq. § 1318 ; *Cotheal* v. *Talmage*, 9 N. Y., 551 ; *Lampson* v. *Cochran*, 16 id., 275 ; *Colwell* v. *Lawrence*, 38 id., 71 ; *Dimech* v. *Corbett*, 12 Moore P. C., 199 ; *Bagley* v. *Peddie*, 16 N. Y., 469.)

*Joseph H. Choate*, for the respondents.    There was nothing in the one dollar clause in the contract which prevented plaintiffs from recovering the full amount of damages they had sustained from defendant's non-performance.    (Sedgw. on Dam., 399 ; Mayne on Dam., 104 ; Field on Dam., 138; *Richards* v. *Edick*, 17 Barb., 266; *Shute* v. *Taylor*, 5 Metc., 67 ; *Leary* v. *Laflin*, 101 Mass., 335 ; *Foley* v. *McKeegan*, 4

Clarke, 7 ; *Crisdel* v. *Bolton*, 3 C. & P., 243 ; *Taylor* v. *San-diford*, 7 Wheat., 13 ; *Wallis* v. *Carpenter*, 13 Al., 19 ; *Admrs. of Smith* v. *Admrs. of Wainwright*, 24 Vt., 103 ; *Baird* v. *Tolliver*, 6 Humph., 186 ; *Haggart* v. *Morgan*, 1 Seld., 422 ; *Ayres* v. *Pease*, 12 Wend., 393 ; *Low* v. *Notte*, 16 Ill., 477 ; *Howard* v. *Hopkyns*, 2 Atk., 371 ; *Harrison* v. *Wright*, 13 East, 343 ; *Winter* v. *Trimmer*, 1 Blackst., 395 ; *Graham* v. *Bickham*, 4 Dal., 149 ; *Spear* v. *Smith*, 1 Den., 464 ; *Staples* v. *Parker*, 41 Barb., 648 ; *Beale* v. *Hayes*, 5 Sandf., 640 ; *Kemble* v. *Farren*, 6 Bing., 141 ; *Carpenter* v. *Lockhart*, 1 Carter [Ind.], 434 ; *Lampman* v. *Cochran*, 16 N. Y., 275 ; *Watts* v. *Sheppard*, 2 Ala., N. S., 425, 446 ; *Davies* v. *Penton*, 6 B. & Cr., 216 ; *Boyd* v. *Ancell*, 5 Bing. [N. C.], 390 ; *Esmond* v. *Van Benschoten*, 12 Barb., 375 ; *Colwell* v. *Lawrence*, 38 N. Y. 74, 77 ; *Horner* v. *Flintoff*, 9 M. & W., 679 ; *Salters* v. *Ralph*, 15 Abb. Pr., 276 ; *Bage* v. *Willard*, 12 N. Y., L. Obs., 57 ; *Noyes* v. *Phillips*, 60 N. Y., 411 ; *Tiernan* v. *Hinman*, 16 Ill., 403 ; *Dennis* v. *Cummings*, 3 J. Cas., 297 ; *Spencer* v. *Tilden*, 5 Cow., 144 ; *Staples* v. *Parker*, 41 Barb., 648 ; *Betts* v. *Burch*, 4 H. & N., 505.)

EARL, J. The plaintiffs were, for many years, retail dealers in the city of New York in ice, and the defendant was a wholesale dealer. In February, 1864, the defendant entered into contract with the plaintiffs to deliver to them 2,000 tons of ice yearly for nine years, commencing on the first day of January, 1864, at two dollars per ton. The ice was to be delivered daily, Sundays excepted, to be sold by the plaintiffs, in their retail business, at such prices as the defendant might establish for each year. In October, 1869, the same parties made another contract, whereby the defendant agreed to deliver to plaintiffs 2,000 tons of ice in each of the years 1870, 1871 and 1872, and 4,000 tons in each of the years 1873 and 1874, at two dollars and fifty cents per ton. The contracts were, in other respects, alike, except the latter provided that if the plaintiffs should, in any year, need

any further quantity of ice than they had thus contracted for, they should take it from the defendant at the price which it was charging persons with whom it had no contracts. Each of these contracts contained the following clauses, which present the main difficulties to be solved upon this appeal: " It is, however, provided, and so understood by the parties to this agreement, that in case of the inability of the parties of the first part to lay up a full supply of ice, or other casualties, then, and in that case the parties of the first part are bound only to deliver and supply to the parties of the second part such proportion of the above amount of ice, during such year, as the quantity of ice laid up, be to their full supply."   " And the parties of the second part hereby agree to pay to the parties of the first part one dollar per ton for each and every ton that they fail to take according to the terms of this agreement; and the parties of the first part also agree to forfeit one dollar per ton for each and every ton that they fail to deliver according to the terms of this agreement."

In 1870 there was a mild winter, and a short supply of ice, and the defendant delivered to the plaintiffs under each contract only 587 tons of ice, claiming that that quantity was all they were entitled to under the first clause above set out; and they, claiming that they were entitled to the whole 2,000 tons under each contract, brought this action to recover damages for the non-delivery of the balance.

It is important first to determine what is meant in the contracts by a " full supply of ice."   Each of these contracts was to run for a long period of time, and the question is, what meaning did the parties attach to these words ?   At the time the contracts were made, the defendant had ice houses for storing ice along the Hudson river, and at Rockland Lake.   It increased the number and capacity of its houses so that in the year 1870 it had a storage capacity of 500,000 tons.   These houses were for the storage of the ice required to supply the demands of its trade.   As its trade from year to year increased, new houses were erected, and

thus all the storage capacity needed and requisite was provided. These houses were conveniently located, and it had facilities for placing the ice in them at small expense. In ordinary seasons they could be filled, the chief item of expense being the cost of labor. Hence in a contract to run for years at a fixed price, which in ordinary times afforded but a fair profit, it is reasonable to suppose that the parties in treating of a full supply had reference to the capacity of the houses thus located. When they were full, the common understanding would be that the company had a full supply; when half full, a half supply.

The court below held that a full supply, as used in these contracts, meant a supply sufficient to meet and satisfy the demands of defendant's ordinary trade and custom as established by existing contracts or orders. This construction furnishes a very uncertain rule for ascertaining in any year how many tons constituted a full supply. It would not be easy to determine what was ordinary and what extraordinary trade and custom; and why confine the trade to that established by " existing contracts or orders ?" The last contract contemplates a trade with persons not having contracts, and it appears that by far the larger part of defendant's trade was with such persons; as in the year 1870 it had contracts for only 71,000 tons, and sold to persons not having contracts upwards of 100,000. Then again, at what time must the contracts and orders be " existing ?" There is no proof that contracts for ice are all made and orders given at the commencement of the year. The court below must have meant any contracts or orders existing during the year, so as to cover the whole quantity of ice sold by the defendant to its customers during the year. This quantity would always be uncertain until the close of the year; and, as the plaintiffs were entitled to daily delivery during the year, how could the amount be ascertained to which they would be entitled in any day or week or month until the year was closed, and the period for delivery was passed? Such a variable and impracticable rule to be

used in ascertaining the quantity of ice to be demanded and delivered under the contracts could not have been comtemplated by the parties. The contracts speak of "their full supply," as if the parties had in mind some definite ascertainable quantity. The plaintiffs plainly understood the words "full supply" as we have construed them, for in the spring of 1870, when they consented to accept 587 tons as their due under each contract, they asserted that the quantity was to be ascertained by measurements then made. They evidently had no idea that they were to wait, before they could ascertain what was a full supply and how much ice they would be entitled to, until it could be ascertained how much ice the defendant would be able to sell during the year in its ordinary trade; that is, in filling its contracts and supplying all customers who should call.

We have thus ascertained one of the factors, 500,000 tons, to be used in ascertaining the quantity of ice to which the plaintiffs were entitled. The only other uncertain factor is the quantity of ice "laid up," within the meaning of the contract. What did the parties mean by these words? During the season of 1870 the defendant had stored in its ice-houses, on the Hudson river and Rockland lake, 147,064 tons of new ice, cut and secured in the ordinary way; it had in the same houses and in barges 18,088 tons of old ice carried over from the previous year; it had placed in its houses, on the Hudson river, 25,548 tons, cut and taken from ponds some miles distant from the river; it had stocked, at various points on the Hudson river, 10,500 tons, and in Saratoga county, the Adirondack region, and at other distant points, on joint account with the Washington Ice Company, 60,-000 or 70,000 tons, to two-thirds of which it was entitled, and during the season it purchased large quantities of ice transported from Massachusetts, Maine and other distant points. In these various ways it obtained ice sufficient to fill all its contracts and supply all its customers, and the court below held all this ice "laid up" within the meaning of the contracts, and that defendant had, therefore, laid up a full supply, and was obligated to deliver the full 2,000 tons under each contract. That this view of the rights and obligations of the parties is erroneous, I cannot doubt.

That this view of the rights and obligations of the parties is erroneous, I cannot doubt.

Both parties were well acquainted with the ice trade and with the contingencies upon which a full supply of ice for the trade depended.   They knew that ice for the New York market was ordinarily supplied from the Hudson river, and from lakes and ponds near by where it could be obtained, and whence it could be transported at small expense, and that the prices in the contracts were inserted in reference to these ordinary conditions.   They knew that at intervals of time, sometimes long and sometimes short, there would be mild seasons when there would be a short supply of ice at the usual places, and that to supply the demand, ice would have to be procured at distant points, and transported at great expense ; and that the market price would thus be greatly enhanced.   They had reason to expect that such a season would occur during the running of the contracts ; hence it was clearly the intention that the defendant should not be absolutely bound to deliver the quantity mentioned in each year, and any construction which practically binds them to do so, as the one given by the court below did, should be discarded.   It is always practicable to supply the market with ice at some price.   It may be brought from the Adirondack region, from Maine, Canada, Halifax, or some other distant land, and the demand fully met.   As the price is enhanced the demand will diminish, and such demand as is left will be supplied at such prices as will remunerate those who take extraordinary measures to procure the ice.   When there is a short supply and an enhanced price, these extraordinary measures will always be resorted to, and they are the ordinary measures of such a season.   It is clear that the parties did not intend that the defendant should be bound to deliver ice procured under such extraordinary circumstances.

Ordinarily the measure of the defendant's obligation to deliver ice would be governed by its obligation to lay up ice, and what was that obligation ?  It was not absolutely bound to lay up a full supply.   The inability to lay up was not

an absolute inability.   It was bound only to use reasonable and practical means to lay up a supply according to the well known usage and practice of those engaged in similar business and such as the plaintiffs might be presumed to have expected from the defendant at the time and under the circumstances in which the contracts were made.   (*Del., L. & W. R. R. Co.* v. *Bowns,* 58 N. Y., 573.)

There is no proof that the defendant did not make reasonable and prudent efforts to lay up its supply from the Hudson river and Rockland lake.   It was not bound to procure ice from distant and unusual places at an expense many times greater than the contract prices.   Hence the defendant would not have been in default to the plaintiffs if it had purchased no ice and procured none elsewhere except upon the river and lake mentioned.

The ice purchased and brought at great expense from distant places was not laid up.   Such ice could not have been intended by the parties, and is not within any fair meaning of the words " laid up " as used in the contracts.   The ice procured on joint account with the Washington Ice Company was in a broad sense " laid up."   But in the construction of contracts, words are not always to be taken literally, but in the sense in which they were used.   To me, for reasons above stated, it is clear that the parties did not understand by these terms that ice was to be regarded as laid up which, in exceptional years of short supply, was procured at distant points and which delivered in New York would cost several times the contract prices.   But the old ice carried over from the prior year, and the ice stacked on the banks of the Hudson river, may be regarded as " laid up."   There is more doubt about the pond ice brought from ponds several miles from the ice-houses on the river and placed therein.   But as it was placed in the ice-houses at no very extraordinary expense, the doubt should be solved in favor of the plaintiffs, and it should be regarded as laid up within the meaning of the contracts.

We have then 201,200 tons of ice laid up; and now having all the factors to solve the problem, we find that the plaintiffs were entitled under the clause first above

set out to 1,609.60 tons under both contracts. Having delivered only 1,174 tons, the defendant was obligated to deliver 435.60 tons more, and for its refusal to deliver them the plaintiffs were entitled to damages unless barred by circumstances now to be alluded to. On the 25th day of May, 1870, it was known that there was a short supply of ice, and the defendant represented to the plaintiffs that it had measured its ice, and that they were entitled under each contract to only 587 tons. The plaintiffs believing this, signed a writing endorsed upon each contract agreeing to accept that quantity as the proportion of ice to which they were entitled. In their complaint they asked to have these agreements set aside as procured by fraud, and the courts below set them aside on that ground. There is very little if any evidence of the fraud. It seems to have been mainly if not wholly a mistake on the part of the defendant in its construction of the contract; that construction being that it had laid up only the 147,064 tons of ice within the meaning of the contracts. It is too much to say that such a view of the contracts could not be honestly entertained. But these agreements were the result of either fraud or mistake, and without closely scrutinizing the evidence, as the plaintiffs were justly entitled to be relieved from them upon one ground or the other, we will not disturb the decision in reference to them.

The next question to be determined is the amount of damages which plaintiffs were entitled to recover, and this depends upon the construction of the clause of the contracts *secondly* above set out. The court below held that the one dollar per ton stipulation is a penalty, and does not limit the amount of damages to which plaintiffs were entitled, and allowed them the market price, sixteen dollars per ton, less the contract price, for every ton not delivered. In this I cannot doubt the court erred. The question whether a sum named in a contract, to be paid for a failure to perform, shall be regarded as stipulated damages, or a penalty, has been frequently before the courts, and has given them much

trouble.  The cases cannot all be harmonized, and they furnish conspicuous examples of judicial efforts to make for parties wiser and more prudent contracts than they had made for themselves.  Courts of law have, in some cases, assumed the functions of courts of equity, and have relieved parties by forced and unnatural constructions from stipulations highly penal.  Where an amount, stipulated as liquidated damages, would be grossly in excess of the actual damages, they have leaned to hold it a penalty.  Where the actual damages were uncertain and difficult of ascertainment, they have leaned to hold the stipulated amount to have been intended as liquidated damages.  No form of words has been regarded as controlling.  But the fundamental rule, as often announced, is that the construction of these stipulations depends, in each case, upon the intent of the parties, as evinced by the entire agreement construed in the light of the circumstances under which it was made.  (Addison on Contracts, 1161; *Main* v. *King*, 10 Barb., 59; *Richards* v. *Edick*, 17 id., 266; *Cotheal* v. *Talmage*, 9 N. Y., 551; *Bagley* v. *Peddie*, 16 id., 469; *Colwell* v. *Lawrence*, 38 id., 71; *Noyes* v. *Phillips*, 60 id., 408; *Lea* v. *Whitaker*, 8 Com. Pleas [L. R.], 70; *Sparrow* v. *Paris*, 7 H. & N., 594; *Shute* v. *Taylor*, 5 Met., 61; *Lynde* v. *Thompson*, 2 Allen, 456.)

What was here intended by the parties ?  The one dollar was certainly intended at least to limit the extent of damages to be paid in case of breach, else there could have been no purpose for inserting it; and effect should be given to this intention if it can be consistently with the rules of law. There is nothing decisive in the language used.  In case of failure by the plaintiffs they agreed " to pay " the one dollar; in case of failure by the defendant it agreed " to forfeit " the same sum.  The words " to pay " and " to forfeit " were evidently used in the same sense, and might be used in case the sum was intended either as liquidated damages or as a penalty.  Considering the length of time these contracts were to run, and the contingencies of the ice trade, and the great fluctuations in the price of ice which might be occasioned by

a short supply, it is natural and probable that the parties should desire in advance to fix the amount to be paid for a failure to perform on either side. The damages which would be occasioned by a breach on the part of the defendant would always have to be ascertained by the conflicting evidence and varying judgments of witnesses (*Cotheal* v. *Talmage, supra*), and hence a motive for fixing the amount. This contract was made in reference to the ordinary conditions of the ice trade, and the amount fixed would ordinarily be a reasonable sum to be paid by the failing party. It would always cover any actual loss which the plaintiffs would incur by defendant's failure. In this case the plaintiffs lost nothing by the failure of the defendant except the large profits they could have made if the ice had been delivered at the contract prices. They received the 1,174 tons, and upon that made large profits. They obtained the balance of their supply at the wholesale market prices, and upon that undoubtedly made at least the usual profit, as the retail price, which was at all times under the control of the defendant and other wholesale dealers, was enhanced so as to leave at least the usual margin between the retail and wholesale prices. A construction which would throw the whole loss, serious, if not ruinous, upon the defendant, and give the plaintiffs profits about seven times greater than the whole purchase price of the ice, would cause the contracts to operate contrary to the intention of the parties, and should not be adopted unless the language and circumstances of the contracts demand it; and that they do not I think has been sufficiently shown.

The extent of plaintiffs' recovery should therefore have been $435.60, and interest from January 1, 1871, unless the further claim made by the plaintiffs, which will now be considered, is well founded.

After the plaintiffs had agreed to accept 587 tons under each contract, they received from the defendant 1,180 tons of ice for which they paid the market prices, and on this quantity the court below allowed the plaintiffs to recover what they had paid therefor in excess of the contract prices.

They had paid for this less than the average market prices upon which the damages for the balance of ice not received by them was estimated. They recovered the excess paid for this ice, not as an independent cause of action ; but as the price paid was less than the average market price, that was taken as the measure of damages giving plaintiffs a complete indemnity rather than the market price. The claim is still made on the part of the plaintiffs that they were entitled to recover the excess paid for so much ice as they were entitled to receive under their contracts which is now determined to have been 435.60 tons. It is impossible for me to perceive upon what ground such a claim can rest. In their complaint the plaint ffs allege that the defendant delivered under each contract only 587 tons, and refused to deliver the balance, and the court at Special Term so found, and such are undoubtedly the facts. The action is brought to recover damages for a breach of the contracts to deliver 2,000 tons, and for nothing else. It is true, that under the latter of the two contracts, plaintiffs were also bound to take of the defendant any additional quantity of ice which they should need. But no breach of that portion of the contract is complained of. If it may be held that the 1,180 tons were delivered under that clause, there is no claim that the plaintiffs did not obtain all they needed, or that the prices charged were not the proper prices. They were not damaged by being induced by fraud, or otherwise, to take ice under that clause, because they did not pay more than the market price for it. The defendant had the right, or, more properly speaking, the power to refuse to deliver the whole or any portion of the 2,000 tons. It thereby incurred the liability to pay the one dollar per ton, and this liability could not be increased, because it was subsequently willing to deliver plaintiffs ice at the market price. The plaintiffs are in the same position as they would have been if they had obtained the additional ice of other parties. So long as the defendant refused to deliver more than the 587 tons on each contract, it matters not that both parties supposed that that was all plaintiffs

were entitled to, and it matters not whether the refusal was based upon fraud or mistake. The rule of damages I have adopted gives the plaintiffs all the indemnity they are entitled to.

But while all my brethren concur in all the views above expressed, except as to the claim of plaintiffs last discussed, a majority of them are of opinion (inasmuch as the plaintiffs were entitled to the 435.60 tons under the contracts for 4,000 tons, and were, by fraud or mistake, induced to take the same under the other clause in the contracts, and pay for the same what defendant was charging other parties with whom it had no contracts, both parties professing and assuming to act in compliance with the contracts) that they are entitled to recover what they paid for the 435.60 tons in excess of the contract prices of two dollars and two dollars and fifty cents per ton. Such excess is $5,531.77, and it was paid on and shortly before September 1, 1870.

The judgment must, therefore, be reversed and new trial granted, costs to abide event, unless plaintiffs will reduce the damages entered in the judgment to that sum, with interest thereon from September 1, 1870, to the date of the judgment; in which event the judgment, as reduced, must be affirmed without costs to either party upon the appeal to this court.

All concur, save as stated in opinion.

Judgment accordingly.