JOHN C. WINCH, Respondent, *against* THE MUTUAL BENEFIT ICE COMPANY, Appellant.

(Decided April 5th, 1880.)

Where a contract for the delivery of a certain quantity of ice provides that for a failure to deliver pursuant to its terms, the party in default shall pay to the other a certain sum for every ton not so delivered, not as a penalty, but as liquidated damages, the plaintiff in an action for such failure to deliver is restricted to a recovery of such sum as liquidated damages.

APPEAL from a judgment of this court entered on the report of a referee.

The action was brought to recover damages for the breach of a contract by the defendant to sell and deliver ice to the plaintiff. The facts are stated in the opinion. Upon trial before a referee he found for the plaintiff, and on his report judgment for the plaintiff was entered. From the judgment the defendant appealed.

*John A. Mapes*, for appellant.

*B. Doran Killian*, for respondent.

VAN HOESEN, J.—The clearness with which this contract is drawn saves us from the embarrassments which involved the Kemp case in confusion.

Winch was to receive from the defendant, in the year 1874, 3,000 tons of ice, and in 1875 4,500 tons, unless there

should happen to be a short supply of ice. A full crop of ice was said by the contract to be 80,000 tons. This crop was to be gathered on the Hudson river and laid in by the steam elevators of the defendant, and ice not so gathered and laid up was not to be measured in determining whether or not the defendant had harvested its full crop of 80,000 tons. In case the defendant did not harvest, by means of its elevators, a full crop of Hudson river ice, the quantity which the plaintiff was entitled to, was to be diminished, and he was to receive such proportion of what he had contracted for as the crop actually harvested bore to a full crop of 80,000 tons. If the defendant actually delivered to the plaintiff, when the crop was short, such a proportion of that crop as the full quantity he contracted for bore to a full crop of 80,000 tons, no claim against it for damages for a failure to comply with its contract could be made. If, however, the defendant refused to deliver to the plaintiff, in any year when a full crop was harvested, the full quantity he had contracted for; or, if in any year when the crop was short the defendant refused to the plaintiff his quota of the short crop, it became liable to pay the plaintiff $1 for every ton which it withheld. On the other hand, if the plaintiff refused to take the quantity contracted for, or the proportion to which he was entitled, he became liable to pay the defendant $1 for every ton which he declined to receive. This is, as I understand it, the meaning of the contract.

It is conceded that in the year 1875 the defendant refused to furnish any ice at all to the plaintiff, and as the quantity contracted for was 4,500 tons, the amount of the plaintiff's damages for that year, if he be entitled to recover anything, is $4,500; that is to say, $1 for every ton which the defendant refused to deliver.

In the year 1874 the defendant delivered to the plaintiff, under the contract, 150 75-200 tons of ice, but refused to deliver any more. There was a short crop that year, only 31,174 53-100 tons of new ice having been gathered and laid in by the elevators of the company.

Of old ice gathered in the ordinary way the previous year, the company had 18,705 52-100 tons. This latter description

of ice was to be included in determining whether the company had, at the beginning of the business year of 1874, 80,000 tons of ice on hand. The words of the contract leave no room for doubt on this point: "If the company shall be unable to lay up the said quantity of ice, i. e., 80,000 tons, or the same shall be lost or destroyed in whole or in part, then any such year or years the said company shall be only bound to supply to the party of the second part (the plaintiff) such proportion of the number of tons contracted for for each year as the said number of tons shall bear to the amount of the ice actually laid up, or actually on hand for that year." It will be borne in mind that in the Kemp case the court of appeals decided that unsold ice gathered in previous years, if fit for market, should be embraced in the estimate of the quantity on hand for the season next ensuing (69 N. Y. 56); but if that decision had not been made, I think that under the plain words of this contract there could be no doubt that the old ice should have been taken into account in ascertaining whether the company could deliver its full quota, or only a pro rata share, to each person with whom it had contracted. Adding the new ice gathered in the Hudson river by the company's elevators for the year 1874, to wit, 31,174 53-100 tons, to the quantity of old ice on hand, to wit, 13,705 52-100 tons, we have a total of 44,880 5-100 tons of ice available, at the beginning of the year 1874, for delivery to contracting parties at the rates stipulated in the contracts. In other words, the company had 56 per cent. of a full crop of 80,000 tons. The plaintiff was entitled, therefore, to 56 per cent. of 3,000 tons, the last-named sum being the quantity he had contracted to receive for the year 1874. The quantity, expressed in numerals, is 1,680 tons. Of that quantity he received, as I have already said, 150 tons; and he was entitled, therefore, to a further delivery of 1,539 25-100 tons. The refusal of the defendant to make such delivery, if unwarranted, entitled the plaintiff to damages to the extent of $1 for every ton, that is to say, to $1,539.25 damages.

The defendant urged, as an excuse for refusing to deliver to the plaintiff his stipulated quantity of ice in 1874 and 1875, that in 1873 the plaintiff had not taken all the ice which by

the contract he was required to receive, and that when a bil for damages for his breach of contract was presented to him, at the beginning of the busy season of 1874, he did not pay it, though told that if he did not pay the company would consider the contract broken and at an end. The plaintiff denied that he refused to receive any ice in the year 1873, and swore that Cheney, the manager of the company, in the early part of the year 1873, repeatedly requested him to supply himself elsewhere, as the company was temporarily short of ice. The referee credited the testimony of the plaintiff, and thought that Cheney, who denied having made any such request or any such statement to the plaintiff, had forgotten the facts; and, after carefully reading the testimony, I am not prepared to say that the referee erred in his conclusion. If he did not, then the refusal of the company to furnish ice to the plaintiff in 1874 and 1875 was entirely unjustifiable, and the plaintiff is entitled to recover damages at the rate stipulated in the contract, viz.: $1,539.25 for the year 1874, and $4,500 for the year 1875, making in all $6,039.25. After the defendant, in 1874, refused to deliver to the plaintiff any more ice under the contract, it professed its willingness to sell him ice at the market price, which was a good deal above the contract rates, and the plaintiff thereafter, during the year 1874, bought of the defendant, at the market price for those who had no contracts with the company, ice, for which he paid $5,676.27 more than he would have been required to pay if it had been furnished to him under the contract. This amount the referee thought the plaintiff entitled to recover from the defendant as money paid by compulsion or coercion. In his opinion the referee cites the cases of *Harmony* v. *Bingham*, 12 N. Y. 99, and *Kemp* v. *The Knickerbocker Ice Co.*, 69 N. Y. 45, as authorities for his decision. Neither of the cases seems to me to support his views. The Kemp case was decided upon the ground that somehow Kemp was deceived or defrauded by the company, or else that he and the company were mutually mistaken as to some fact, so that either on the ground of fraud, or on the ground of mistake, Kemp should be allowed to recover the amount which he had paid in excess of the contract price

for a portion of the ice sold him by the Knickerbocker Ice Company after its refusal to comply with its contract. In this case there is neither mistake nor fraud, so that the Kemp case is no authority for the referee's judgment. The case of *Harmony* v. *Bingham* goes no farther than to hold that money paid under duress of goods may be recovered back. That surely does not support the referee's conclusion. It is true that Judge EDWARDS, in the course of his opinion, in *Harmony* v. *Bingham*, comments upon several cases which he says seem to allow of a recovery of money paid under circumstances of great urgency; but the court did not decide that anything less than duress of person or of goods would invalidate a payment made with a knowledge of the facts. In this case the plaintiff was fully apprised of all the facts, and made the payments in excess of the contract price because he thought it for the advantage of his business to do so. The wholesale price of ice was high, and the retail price was perhaps raised in proportion, if not out of all proportion. The plaintiff was not in any stress; he had a contract with the Knickerbocker Ice Company at the same time, and was at liberty to buy ice from any other dealer. Ice in abundance was to be had in the New York market, and the plaintiff was not compelled to accept the alternative of losing his trade for want of the means of supplying his customers, or submitting to the defendant's extortionate demands. Besides, the contract evidently contemplated just such a state of affairs as occurred. For a short supply the defendant was not responsiblĕ; but, if having a full supply, and able to perform its contract to the uttermost, it refused to furnish ice as it had agreed, it limited its liability, by its agreement with the plaintiff, to the payment of $1 per ton as damages. It matters not that the defendant had ice on hand which it ought, by the terms of its contract, to have delivered at the price named in the instrument; it matters not that its breach of its agreement was willful; it matters not that it offered for sale, and that the plaintiff bought, at a high price, the very ice which it had agreed to sell for a low price; the contract, which was the contract of the plaintiff no less than that of the defendant, in effect de-

clared that a willful refusal to receive, or to deliver, ice, should involve no other liability to the injured party than the pay ment of $1 per ton by the party in default, in full of all dam- ages. This is, as I understand it, the meaning of the agree- ment. The damages are liquidated.

The judgment should be modified by reducing the damages to $6,039.25; but, as the damages are liquidated, no interest should be allowed (4 Wait's Law of Actions and Defenses, 137), and as modified the judgment should be affirmed without costs of this appeal. The costs below are not touched by this decision.

CHARLES P. DALY, Ch. J., and J. F. DALY, J., concurred.

Judgment modified accordingly.*

---

* The judgment entered upon this decision was modified, on appeal to the court of appeals, by adding $1,748.22, the item of interest, and as modified affirmed, October 4th, 1881. (See 86 N. Y. 618.)