CALLANAN ROAD IMPROVEMENT COMPANY, Plaintiff, *v.* COLONIAL SAND AND STONE CO., INC., Defendant.

Supreme Court, Trial Term, Albany County, July 29, 1947.

*Thomas W. Cantwell* for plaintiff.

*Jacob I. Goodstein* for defendant.

BERGAN, J. Plaintiff is in the business of manufacturing crushed stone. Defendant is in the sand and stone business and, among other enterprises, manufactures ready-mix concrete in which crushed stone is an ingredient.

On April 5, 1944, the parties entered into a written agreement by which plaintiff was to furnish and deliver and defendant to buy and accept a minimum of 50,000 cubic yards of crushed stone at $1 a cubic yard plus transportation and taxes.

The contract provided that if there was a breach by defendant of its terms defendant would pay plaintiff as liquidated damages the sum of fifteen cents a cubic yard for the part of the minimum quantity not taken. Plaintiff's quarry was in Kingston; delivery was to be made by water in the New York City area at points south of Peekskill designated by defendant.

The defendant under the contract must be credited with the acceptance of 19,758 cubic yards. Concededly the balance of the minimum, 30,242, has not been accepted. Plaintiff may recover under the provisions of the contract for liquidated damages at fifteen cents a cubic yard unless that provision is not enforcible according to its terms. The problem centers on the conditions under which a contract, in terms providing for liquidated damages for its breach, is enforcible.

Almost one hundred years ago in a very early case in the Court of Appeals, Judge RUGGLES noted the difficulty which the courts have somehow experienced with a subject which, in judicial theory, at least, ought readily to be classified and applied. (*Cotheal* v. *Talmage,* 9 N. Y. 551.)

Many more complex and intrinsically less tractable subjects have been reduced to order; this one, from the struggles of the English judges with it before the Revolution to the present time, remains oddly elusive.

" The ablest judges have declared that they felt themselves embarrassed ", said Judge RUGGLES (p. 553), " in ascertaining the principle on which the decisions * * * were founded." Many years later, Judge GRAY, writing in *Ward* v. *Hudson River Building Co.* (125 N. Y. 230, 235), felt that any statement of a general rule was difficult, " if it is even possible ".

The professional draftsmen of contracts, seeking to effectuate in language the purpose of mature and experienced men having skilled knowledge of a special field to save expense of litigation by agreeing on what damage would result from a breach, were at loss to suggest the words that would serve the reasonable needs of their clients.

There seemed to be no sure footing on which to prepare for judicial testing of language and purpose, and Judge ANDREWS felt it necessary to say in *Hackenheimer* v. *Kurtzmann* (235 N. Y. 57, 67), that the implications of the opinion in *Seidlitz* v. *Auerbach* (230 N. Y. 167), which he also wrote, might be pressed so far as to make it impossible to draw any contract providing for liquidated damages, a burden on the freedom to contract, which, of course had not been intended.

Chancellor WALWORTH, writing in 1839 for the Court of Errors in *Williams* v. *Dakin* (22 Wend. 201, 213), expressed the view that in dealing with the purpose of parties to provide a liquidated amount for damages, the court ought not try to make a better or a different agreement for the parties than they intended to make for themselves.

Judge VANN in *Curtis* v. *Van Bergh* (161 N. Y. 47, 52) noted that courts had " struggled hard " against the apparent intention of the parties in order to relieve the one in default from an improvident bargain and Judge RUGGLES attributed a substantial part of the confusion of the law on liquidated damages to the endeavor by judges to " make better contracts for parties " than they themselves made. (*Cotheal* v. *Talmage,* 9 N. Y. 551, 554, *supra; Crisbee* v. *Bolton,* 3 Car. & P. 240.)

This apparent insinuation of judicial views and evaluations interstitially into the texts of legal draftsmen and into the avowed purposes of their clients, was in truth a regulation of contracts in the public interest, and it involved two important principles of public policy to which, as a matter of sheer necessity, contracts must yield.

One is that the amount of agreed damage for a breach of contract to pay a fixed sum of money cannot exceed that amount plus lawful interest; for, of course, without this safeguard, parties could contract their way around the statute against usury. The other is that the court would not enforce a grossly disproportionate, oppressive or unconscionable amount of damage, even though solemnly agreed to in writing, and this stems from a policy that runs in the fabric of the common law which, if not exactly humane, was at least good sense and good public policy.

This latter policy clearly existed in the face of some quite sweeping judicial disavowal. See, for instance, the language of Chief Justice NELSON in *Dakin* v. *Williams* (17 Wend. 447, 454), when the case (referred to *supra* as *Williams* v. *Dakin*) was before the Supreme Court. A court, he said, cannot inquire whether parties " acted wisely or rashly "; men may make improvident contracts where the advantage is " knowingly and strikingly against them ".

Still, the policy of keeping enforcible liquidated damages within reason was quite generally followed, and it had an interesting corollary, i.e., where several conditions were to be performed the fitness of the liquidated damage would be judged by the condition most disproportionate or inappropriate to the

damage fixed. The strength of the chain would be judged by its " weakest link ". Good examples of the development of this policy are to be found in *Jackson* v. *Baker* (2 Edw. Ch. 471); *City of New York* v. *Brooklyn & Manhattan Ferry Co.* (238 N. Y. 52); *Seidlitz* v. *Auerbach* (230 N. Y. 167); *Lampman* v. *Cochran* (16 N. Y. 275) and *Niver* v. *Rossman* (18 Barb. 50). There is some discussion of it, too, in *Dakin* v. *Williams* (17 Wend. 447, 459, *supra*), while the case was in the Supreme Court.

Sometimes there has been difficulty in ascertaining intent, but the case at bar is quite explicit in the use of words, at least, that liquidated damage and not forfeiture or penalty were what the parties here had in mind, and Judge POUND was of opinion that explicit statement in this direction was one of the criteria of a valid provision (*City of New York* v. *Brooklyn & Manhattan Ferry Co.*, 238 N. Y. 52, 57, *supra*).

It is argued by defendant that if there is an open market for the stone, the market is the only admissible measure of damage; and in those circumstances the right of the parties to fix their own damage is closed. This is in truth an argument against freedom to contract on the subject; and a fair evaluation of the trend of authority in New York does not sustain it.

On the contrary, in the rather large area that lies between contracts for the payment of money which require the payment of a greater sum than the principal on a breach, and those contracts which call for grossly disproportionate damage for a breach, contracts fixing liquidated damages are quite generally upheld. (25 C. J. S., Damages, § 101, p. 651.)

It is consistent with public policy and with judicial policy for parties to agree in advance on their damage, as surely they could do after a breach, and to provide against the trouble and expense of future investigation. These principles were stated both by the Chancellor for the Court of Errors and by the Chief Justice for the Supreme Court in the litigation between Dakin and Williams. (See 22 Wend. 201, 213 and 17 Wend. 447, 454, 455.)

In *Caesar* v. *Rubinson* (174 N. Y. 492), the court was of opinion that the damage provided was grossly disproportionate, and *Weinstein & Sons, Inc.*, v. *City of New York* (264 App. Div. 398) relied on by defendant turned on the same point. But no one has suggested there is anything disproportionate about the amount of fifteen cents per cubic yard reserved as liquidated damages in the contract here under consideration.

Perhaps the best statement of the principle to be applied in the area between the two condemned extremes was made by

Judge RUGGLES in the *Cotheal* case (9 N, Y. 551, 554, *supra*). Where the damages are uncertain in amount the parties have a right to say how much shall be paid by way of compensation to the party injured. His test of "uncertainty" of damage was that it always exists in a legal sense in all other cases than agreement to pay a fixed amount, i.e., unless damage is liquidated as a matter of law.

Very close to this definition, and amplifying it somewhat is that of Judge GRAY in *Ward* v. *Hudson River Building Co.* (125 N. Y. 230, 235, *supra*), who felt that damages in their nature uncertain and unascertainable with exactness and which may be dependent on extrinsic circumstances, are the subject of agreement.

It is interesting to note that in quoting this language exactly, Judge VANN added the preface "at the time the agreement was made." (*Curtis* v. *Van Bergh,* 161 N. Y. 47, 52, *supra.*)

If the parties could fix a price other than a market for dealings in their present transactions, they certainly could agree to a price other than a market in an unknown future, just as well as they could agree to be bound by the market as it might exist in the future.

The principle of such agreement was applied without hesitation to the sale of ice, by a court which was, however, mainly concerned in other aspects of a complicated contract in *Kemp* v. *Knickerbocker Ice Co.* (69 N. Y. 45, 59). Cases like *Haughey* v. *Belmont Quadrangle Drilling Corp.* (284 N. Y. 136) and *Franklin Sugar Refining Co.* v. *Lipowicz* (220 App. Div. 160) do not concern themselves with liquidated damages and are not pertinent.

Plaintiff and defendant were in business where they dealt constantly with crushed stone. Their officers knew the subject matter. They were dealing with a specialized field and they were dealing with the future. I do not regard the existence of an open market at the time of the breach as having any necessary relation to the agreement made for damage in advance of a breach, unless the parties themselves make the market the criterion of damage.

They were free to accept the future market, which they could not exactly foresee, or fix their own standard of damage. The validity of the agreement is to be tested as of the time when made. There was a "market" for crushed stone in New York City at the time of the breach, but the proof here is, and I find, that the New York market in 1944 was so monopolized that plaintiff could not invade it except at great risk and expense

and, as the record here shows from the attempts that were made, with great uncertainty.

The parties fixed their own obligations with intelligence and with a knowledge both of the subject with which they dealt and what would be reasonable to expect as damage flowing from a breach. I do not see any good reason for a court to try to improve on what they agreed to do; or any judicial ability to deal more sensibly with the subject; or any authority in the court to declare invalid what it was plainly their right to engage to do and which they undertook to set out plainly in writing. On the subordinate question of the disputed discount, I also find for plaintiff.

Judgment for plaintiff for $4,733.15, with interest and costs. Submit decision.