G-. Robert Wither, J.
This is an action for a judgment declaring a lease of defendants’ realty, known as the “ Burke Building” in Rochester, New York, valid and subsisting and reinstating plaintiff as tenant in said building, requiring defendants to account for rents collected by them since they resumed possession of the building, vacating and canceling of record a purported discharge of the mortgage by the defendants to plaintiff on said building and determining the amount due thereon to plaintiff, and for judgment of foreclosure and sale of said building for the payment of the note secured by said mortgage. The defendants counterclaim for judgment declaring said lease terminated as of February 19, 1960 and directing the County Clerk to discharge of record the memoranda of said lease recorded in his office, and for judgment declaring obligation to plaintiff upon a certain promissory note terminated as of February 19, 1960, and declaring the mortgage securing said note validly discharged of record.
The lease was made in March, 1955 by defendants to Realty Appraisers, Inc., for a term of 30 years at the annual rent of $140,800 payable monthly in advance in installments of $11,733.33. There was provision for “ additional rent ” in the event the real estate taxes on the building should exceed the amount thereof for the year 1955, the tenant to pay as ‘ ‘ additional rent ” any amount by which the taxes should exceed such sum. The tenant also undertook to make all necessary repairs to keep the building tenantable and insurable, and agreed to *41 keep the building properly insured. It was provided that if the tenant should default for a period of five days in the payment of any installment of rent or ££ additional rent”, the landlords could give 10 days’ written notice to the tenants of landlords’ election to terminate the lease, and at the end of such period the tenant’s right of occupancy of the building would cease and the landlords could have possession. It was further provided that in the event of the landlords’ re-entry, the tenant would continue liable for the rent for the duration of the 30-year term and would pay to the landlords any deficiency in rents actually collected by the landlord after re-entry; and that the words “ re-enter ” and “ re-entry ” should not be restricted to their technical meaning.
At the time of executing the lease the tenant paid to defendants the sum of $110,000 and defendants gave back to the tenant a promissory note in such amount bearing interest at 3% per annum and executed a second mortgage on the building to the tenant to secure repayment of said $110,000. The note ran for the period of the lease, and provided that if the lease were renewed the note would be extended for the new period of the lease. It was further provided in the note and in the mortgage securing it that the defendants would not be personally liable thereon, and the payee-mortgagee (tenant) would look “ wholly and solely” to the mortgage security for payment. In paragraph 15 of the mortgage it was provided in part that the lease afore-mentioned ‘£ was made as part of the consideration for this mortgage. It is therefore agreed that in the event of default by the tenant in said lease or the tenant’s successors or assigns and if as a result of said default the lease is legally terminated, that then in such event, there shall be no obligation on the part of the mortgagors to pay any interest or principal unless and until all defaults shall have been cured, and upon failure of the tenant to cure said default, resulting in termination of the lease, this mortgage shall be of no further force and effect and the lien of this mortgage shall wholly cease and terminate. That the mortgagee hereby irrevocably appoints the mortgagors or their assigns, as attorneys in fact for the purpose of executing any and all necessary papers to assign said mortgage to the mortgagors and/or their designees, or at the election of the mortgagors, or their assigns, to discharge said mortgage, upon the termination of the lease.”
Realty Appraisers, Inc., took immediate possession of the building under the lease. In October, 1955 it sold and assigned its interest in said lease and in the promissory note and mortgage securing the note, to plaintiff corporation for the sum of *42 $130,000. The parties to that transaction made no allocation of such price as between the lease and the note and mortgage. The plaintiff then proceeded to manage the building.
In 1959 plaintiff fell into arrears in its payment of the rent. On January 20, 1960 defendants gave to plaintiff a written notice of default and election to terminate the lease on February 1, 1960. Thereafter plaintiff, through its president and principal officer and stockholder, who was also an attorney at law with years of specialized experience in real estate and leases, negotiated with defendants for withdrawal of defendants’ election to terminate the lease, and on January 28, 1960 the parties entered into a letter agreement consisting of six pages. By this agreement plaintiff made defendants its agent for managing the building, and pursuant to the agreement plaintiff notified tenants to pay rent to defendants or to a rental agency which in turn was directed to account to defendants; and defendants undertook to manage the building for the benefit of the plaintiff, without prejudice to their right to terminate the lease at any time. The agreement contained the provision that “We, and you by your acceptance hereof, agree that at any time hereafter either of us may by written notice delivered by registered mail to the other party terminate this letter agreement, effective ten days after the date such notice is deposited in the mail, whereupon the terms and conditions of this letter agreement will be deemed to have no force or effect and the rights and liabilities of the parties under said Lease shall be determined as of any time theretofore or thereafter without regard for the terms and conditions of this letter agreement. If on the effective date of such termination, you are in default in the payment of rent or £ additional rent ’ due under said Lease, we may by written notice delivered to you at the above address on or before such effective date terminate the Lease on such effective date pursuant to the third paragraph of Article Thirteenth of said Lease (any provisions thereof to the contrary notwithstanding). ’ ’
The agreement contained the further provision that in consideration of defendants’ forbearance to terminate said lease 1 ‘ until such time as this letter agreement is terminated as provided below ”, (1) no interest would be payable on the said note, and (2) “If upon the termination of this letter agreement you are in default in the payment of rent or ‘ additional rent ’ due under said Lease, the obligation to pay principal and interest on the said Mortgage Note will thereupon be cancelled and said Mortgage shall be of no further force and effect and the lien of said Mortgage shall thereupon wholely [sic] cease *43 and terminate pursuant to the provisions of paragraph 15 of said Mortgage (any provisions thereof to the contrary notwithstanding).” This latter paragraph was especially initialed by plaintiff’s president.
Pursuant to said letter agreement defendants resumed possession and management of the building. Almost immediately defendants became aware that conditions in the building were much worse than they had realized. They learned that tenants were on the point of leaving unless substantial repairs were made at once, and that the fire underwriters had ordered many changes and improvements to be made, which remained undone. Defendants found that plaintiff had not kept the building repaired as required by the lease, and that they would have to spend many thousands of dollars in repairs in order to satisfy the underwriters and to prevent serious loss of tenants. In view of such facts and the previous months of partial delinquencies in rental payments, on February 9, 1960 defendants gave a new 10 days ’ written notice to plaintiff of termination of the lease. Plaintiff was then in default in rent and “ additional rent ” payments in a sum in excess of $19,000. February rents received on February 12,1960 under the letter agreement reduced such defaults to an amount in excess of $10,000.
Plaintiff took no steps to cure its default within the period of 10 days specified in the notice. Nevertheless, it appears that thereafter and late in March, 1960, after defendants had unsuccessfully sought an assignment from plaintiff of the building subleases, defendants offered to continue the lease and letter agreement provided plaintiff would cure its default, including payment of rental arrearages and payment for some repairs; but the plaintiff, through emphatic language of its president, refused to do that.
In the Summer of 1960 defendants, acting under the provision of the mortgage which authorized them to discharge the mortgage in the. event of default, executed and recorded two discharges of said mortgage.
In November, 1960 one of defendants’ attorneys saw plaintiff’s president and requested that the memoranda of lease which had been recorded be cancelled of record. Upon plaintiff’s refusal to cancel it, said attorney told plaintiff that an action would be brought by the defendants for its cancellation, to clear the title to the property. Shortly thereafter plaintiff instituted this action.
In support of its action to declare the lease subsisting and to reinstate plaintiff as tenant of the building, plaintiff contends that by the letter agreement it was understood that in *44 any event defendants would manage the building as agents for plaintiff until September, 1960, that defendants had no right to terminate the lease before September, 1960, and that defendants used the letter agreement as a device to get plaintiff out of the building without instituting a proceeding for possession, and that defendants acted in bad faith and in fraud of the plaintiff.
It is true that defendants’ second notice of termination of the lease followed swiftly (nine days) upon their assuming the management of the building under the letter agreement. If plaintiff’s contention be correct that defendants entered into the agreement to avoid the delay and expense of a summary proceeding or other action to obtain possession, it would seem that defendants were giving up a substantial right, to wit, the right to have the lease completely terminated on February 1 by reason of the notice of January 20 under plaintiff’s default, to avoid the rather simple proceeding for evicting the plaintiff for its default. It may be that by receiving voluntary possession before February 1, defendants also obtained some February rent which plaintiff might otherwise have received; but it appears that most of those rents were not due to be and were not paid over until February 12, within which time defendant might have gained possession by summary proceedings. Defendants denied acting in bad faith, and they placed in evidence documents which came into their hands after they obtained possession of the building on February 1, 1960, which show that the building had fallen into disrepair and was under criticism by the board of fire underwriters. Upon such evidence and the evidence of the danger of losing tenants and the need for the prompt expenditure of money for repairs, I find that defendants acted in good faith in connection with the letter agreement and their second notice of termination of the lease. This is confirmed by the admission of plaintiff’s president that in March, 1960 defendants offered to continue the lease and letter agreement if plaintiff would pay up the rental arrears and advance a certain amount for needed repairs.
Plaintiff’s contention that it was agreed that in any event defendants would manage the building for plaintiff until September, 1960 is contrary to the express terms of the letter agreement. In view of the personal approval of said. letter agreement by plaintiff’s president, the court cannot find that such oral agreement was made. It is also noted that it was not contended in March, 1960 that defendants were bound to manage the building for plaintiff until September, 1960, but plaintiff then requested that defendants do so.
*45 The lease was, therefore, terminated according to its terms on February 19,1960, and plaintiff’s interest therein ceased at that time.
In its complaint and in the examination before trial of its president, plaintiff claims that the $110,000 loan to defendants was in fact paid as security for performance of the terms of the lease, and defendants have confirmed this. Plaintiff, therefore, claims that it is entitled to repayment of said sum less any unpaid rents and possibly some repair expenses incurred by defendants. In other words, it claims that the sum was deposited or loaned not as liquidated damages upon default but as security only for computable damages upon default. The parties did not expressly characterize the nature of the deposit, other than to call it a “loan”. Defendants contend that the very nature of the transaction shows that it was not a loan and was not merely security for computable damages, but was an amount fixed as liquidated damages in event of default.
Whether a deposit constitutes liquidated damages or security for ascertainable damages is a troublesome question. (Ward v. Hudson Riv. Bldg. Co., 125 N. Y. 230, 235; 1 Rasch, Landlord and Tenant, § 276; 5 Corbin, Contracts, § 1058; 14 N. Y. Jur., Damages, § 157.) What the parties call the deposit when it is made is by no means conclusive upon the court. (United States v. Bethlehem Steel Co., 205 U. S. 105, 120; Caesar v. Rubinson, 174 N. Y. 492; Tode v. Gross, 127 N. Y. 480, 487; Ward v. Hudson Riv. Bldg. Co., 125 N. Y. 230, supra; Stimpson v. Minsker Realty Co., 177 App. Div. 536, 539.) “ The tendency of the courts in doubtful cases is to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages, even where the parties have styled it liquidated damages rather than a penalty.” (City of New York v. Brooklyn & Manhattan Ferry Co., 238 N. Y. 52, 56; 1 Rasch, Landlord and Tenant, § 280.)
It is said that whether the deposit should be treated as liquidated damages or as a penalty depends upon the intention of the parties as disclosed by the terms of the agreement and by the situation as of the date of the agreement, and not as of the breach (Seidlitz v. Auerbach, 230 N. Y. 167, 172-173; Dunn v. Morgenthau, 73 App. Div. 147, affd. 175 N. Y. 518; 14 N. Y. Jur., Damages, § 157; 1 Rasch, Landlord and Tenant, § 277; 5 Corbin, Contracts, § 1059); and that despite the intention of the parties that the deposit be for liquidated damages in the event of default, the amount of deposit must be based upon a reasonable estimate of what the damage would be. (5 Corbin, Contracts, § 1059, p. 291.) But it is also said that the courts, *46 besides considering the factual situation confronting the parties at the time of the agreement, will also consider the equity and reasonableness of the result after the breach. (5 Corbin, Contracts, § 1063.)
In cases where the actual damages to be sustained by the default are difficult of determination, but nevertheless will be real and substantial, an agreement for liquidated damages will be sustained, if it appears that the sum is not disproportionate to the probable loss. (Sun Print, & Pub. Assn. v. Moore, 183 U. S. 642, 673-674; J. & H. Garage v. Flow Corp., 225 App. Div. 65, affd. 251 N. Y. 553; Hackenheimer v. Kurtzmann, 235 N. Y. 57, 67; Mosler Safe Co. v. Maiden Lane Safe Deposit Co., 199 N. Y. 479; Curtis v. Van Bergh, 161 N. Y. 47; Ward v. Hudson Riv. Bldg. Co., 125 N. Y. 230, supra; Clement v. Cash, 21 N. Y. 253, 256, et seq.; Cotheal v. Talmage, 9 N. Y. 551; Callanan Road Improvement Co. v. Colonial Sand & Stone Co., 190 Misc. 418, Beegan, J.; 1 Rasch, Landlord and Tenant, §§ 276, 279; 5 Corbin, Contracts, § 1060; 14 N. Y. Jur., Damages, §§ 155, 161.) In Sun Print. & Pub. Assn. v. Moore (183 U. S. 642, 673, 674, supra) the court said:
“ The law does not limit an owner of property, in his dealings with private individuals, respecting such property, from affixing his own estimate of its value upon a sale thereof, or on being solicited to place the property at hazard by delivering it into the custody of another for employment in a perilous adventure. If the would-be buyer or lessee is of the opinion that the value affixed to the property is exorbitant, he is at liberty to refuse to enter into a contract for its acquisition. But if he does contract and has induced the owner to part with his property on the faith of stipulations as to value, the purchaser or hirer, in the absence of fraud, should not have the aid of a court of equity or of law to reduce the agreed value to a sum which others may deem is the actual value. And, as pertinent to these observations, we quote from the opinion delivered by Weight, J., in Clement v. Cash, 21 N. Y. 253, where it was said (p. 257):
“ When the parties to a contract, in which the damages to be ascertained, growing out of a breach, are uncertain in amount, mutually agree that a certain sum shall be the damages, in case of a failure to perform, and in language plainly expressive of such agreement, I know of no sound principle or rule applicable to the construction of contracts, that will enable a court of law to say that they intended something else. Where the sum fixed is greatly disproportionate to the presumed actual damages, probably a court of equity may relieve; but a court of law has *47 no right to erroneously construe the intention of the parties, when clearly expressed, in the endeavor to make better contracts for them than they have made for themselves. In these, as in all other cases, the courts are bound to ascertain and carry into effect the true intent of the parties. I am not disposed to deny that a case may arise in which it is doubtful, from the language employed in the instrument, whether the parties meant to agree upon the measure of compensation to the injured party in case of a breach. In such cases, there would be room for construction; but certainly none where the meaning of the parties was evident and unmistakable. When they declare, in distinct and unequivocal terms, that they have settled and ascertained the damages to be $500.00, or any other sum, to be paid by either party failing to perform, it seems absurd for a court to tell them that it has looked into the contract and reached the conclusion that no such thing was intended; but that the intention was to name the sum as a penalty to cover any damages that might be proved to have been sustained by a breach of the agreement.’ ”
In the light of the above principles, we consider the terms of the lease, note and mortgage, composing the agreement of March, 1955, and the confirming letter agreement of January 28, 1960. By the terms of the note defendants were not held personally responsible for its payment. No principal payments were due on the note until its maturity; and its maturity was coterminal with the termination of the lease 30 years hence. The interest rate was low. In the mortgage given to secure the note, it was provided, as quoted above, that if the lease be terminated by reason of defendants’ default, the obligation on the note and mortgage would cease and the defendants were authorized to discharge the mortgage. After the default of January, 1960 plaintiff entered into the new agreement on January 28, 1960 reaffirming said provisions of the mortgage that upon termination of the lease by reason of default all obligations on the note and mortgage would cease and the defendants would be authorized to discharge the mortgage of record.
The agreement clearly was one for liquidated damages; and it must be upheld as such unless it is found to be unreasonable and unconscionable. To determine that question, we must briefly review the factual setting of this agreement.
The leased building was valued at well over $1,000,000. It had a first mortgage on it in excess of $800,000. The annual real estate taxes were about $45,000. The lease was for a 30-year period, with annual rent of $140,800. The lessee took the *48 lease not to occupy the premises for itself, hut solely to obtain the income which the building could earn. The lessee took over the management of the building and its repair and maintenance, and became chargeable with satisfying the occupying tenants; and the lessee relieved the defendants of all responsibility for operating the building. If the lessee were successful in its endeavors under the lease, defendants were assured of a substantial net income therefrom, far in excess of $1,000,000, plus, at the end of the term, a building in good repair and nearly free and clear of mortgages. If the lessee should fail to maintain the premises in good repair, fail to please the occupying tenants and keep the building well rented, and default in its lease, defendants had much to lose. They ran the risk of the lessee “ milking ” the property, allowing it to run down, causing defendants to lose the benefits of their bargain, and requiring the defendants to return to the business of managing the building themselves, repairing the structure and regaining satisfactory and satisfied tenants. Such loss was incapable of exact pre-estimation, and in fact is still incapable of computation.
In the light of such possibilities, the parties agreed that the lessee should pay to the defendants the sum of $110,000 to be held, under a stated arrangement, in effect, as liquidated damages in the event the lessee failed to perform its bargain. In the light of the authorities, the court cannot say that such deposit and bargain for liquidated damages was unreasonable or unconscionable.
In Seidlitz v. Auerbach (230 N. Y. 167, supra), a lease case, the court held that since the agreement would permit the forfeiture of the deposit for even a minor default, the deposit must be held to be a penalty and not liquidated damages. Shortly thereafter, the Court of Appeals had another occasion to consider the nature of a deposit made under an agreement in which there could be minor or major defaults. (Hackenheimer v. Kurtzmann, 235 N. Y. 57, 65, supra.) The court referred to the Seidlitg case (supra) and in limiting its scope said (p. 67) that the principle thereof ‘ ‘ may be pressed to so extreme a conclusion as to make it impossible to draw any contract providing for such [liquidated] damages.” It held that where it appears that the deposit was made primarily to protect a major objective, the agreement will be construed accordingly, and upon a default with respect to such objective the designation of the deposit as liquidated damages will be upheld. And it has been held that where the parties are well experienced in the subject matter of the agreement, their judgment of the liquidated damages in the event of default will not be disturbed. (Callanan *49 Road Improvement Co. v. Colonial Sand & Stone Co., 190 Misc. 418, supra [Bergan, J.].)
Some aid in determining whether or not the default in the case at bar was major or minor may be gained from considering the conduct of the parties, especially the plaintiff. After receiving the notice of January 20, 1960 of the election to terminate the lease, plaintiff negotiated with defendants to withdraw their election to terminate the lease and to have them take over the management of the building and endeavor to save plaintiff’s rights in the lease without plaintiff contributing money or effort thereto. The agreement of January 28,1960 under which defendants undertook to do this expressly preserved defendants’ right at any time to serve a 10 days’ notice of election to terminate the lease, and thereby, if the default were not cured, terminate plaintiff’s interest in the deposit. On receiving such new notice on February 9, 1960 of election to terminate the lease on February 19, 1960 plaintiff did nothing to protect its rights; and later in March, 1960 plaintiff expressly refused to take any such action.
Although the legal interpretation of the agreement may have been in doubt, plaintiff certainly knew after executing the letter agreement on January 28, 1960 that it had in fact agreed that in event defendants should terminate the lease because of plaintiff’s defaults, it would lose all rights in the deposit. Despite this knowledge, plaintiff declined to act to cure its default. Plaintiff knew better than anyone else the condition into which the building had deteriorated and the attitude and status of the subtenants. When it made a calculated determination not to put any more money into the building to preserve its rights in the lease and the deposit, it expressed its judgment of the extent of the default which it had made or permitted. Under such circumstances, it is hardly in a position to ask the court to declare that it would be unconscionable for the agreement of the parties to be enforced as made.
The primary purpose of the deposit herein was not to guard against a minor default but to guard against a default in covenants which would result in termination of the lease and in substantial damage which was impossible of computation, including the burden placed upon defendants of terminating the lease and resuming the management of the building. The deposit herein was made as liquidated damages for the default which occurred. This interpretation of a lease agreement was adopted by the court in J. & H. Garage v. Flow Corp. (225 App. Div. 65, affd. 251 N. Y. 553, supra), Finch, J., writing for the Appellate Division. There the court considered an agreement for *50 liquidated damages of $10,000 in the event of surrender of the lease. The rent was $19,000 per year. The court sustained the agreement for liquidated damages.
Accordingly, it is held that the deposit of $110,000 constituted liquidated damages, and upon termination of the lease, the deposit became the property of the defendants, at which time all obligations of plaintiff with respect to the lease ceased. Under the terms of the mortgage, paragraph 15 quoted above, and the letter agreement, Exhibit 12 also quoted above, wherein plaintiff gave to defendants, in the event of default, the right to discharge said mortgage of record, it is held that the defendants thereupon had the right to discharge said mortgage of record.
The plaintiff’s actions to be reinstated as tenant, to require defendants to account for the rents, to vacate and cancel the discharge of mortgage and to determine the amount due thereon and for foreclosure thereof are, therefore, dismissed. In accordance with the prayers of the complaint and counterclaim for declaratory judgment it is held that said lease was terminated on February 19,1960, the obligations of plaintiff and defendants thereunder ceased on that day, all obligations on said promissory note and on the mortgage securing it also ceased that day; and that the subsequent discharge of said mortgage recorded by the defendants constituted a valid discharge thereof. In addition, defendants are entitled to judgment directing the Monroe County Clerk to discharge of record the said memoranda of lease recorded in his office.