William C. Heght, Jr., J.
This controversy has its genesis in a written contract between defendant Corn Products and *635 plaintiff Beacon Plastic & Metal Products, dated December 31, 1963, by which Beacon agreed to manufacture 750,000 Bosconaught figurines for Corn Products, at a price of $45 per thousand, or a total amounting to $33,750. Corn Products agreed to deposit $8,437.50 with Beacon, to be applied against delivery of figurines aggregating that purchase price. The balance of the order was to be invoiced as it was delivered.
The pertinent provisions of the contract follow (pars. 8, 9,11):
“ 8. Delivery of the figurines shall be made to us at your plant, at the rate of approximately 36,000 figurines per day. Title to the figurines shall pass to us immediately upon the manufacture, and we will arrange for their pick-up at approximately the same rate. Delivery shall commence on February 5,1964.
“ 9. You have been informed of the circumstances and timetable of our Bosco promotional program of which your work under this contract will form an essential part. Inasmuch as your breach of this contract by reason of any late delivery will cause serious and substantial damage to us, the amount of which inay be difficult or impossible of measurement, it is agreed that in lieu of liquidated damages for lateness on your part in making deliveries as required by the contract, the purchase price for each thousand figurines of the first 144,000 delivered shall be reduced by $2.25 for each day elapsing between February 10, 1964 and date of delivery; the purchase price for each thousand figurines of the next 360,000 delivered shall be reduced by $2.25 for each day elapsing between February 26, 1964 and date of delivery; and the purchase price for each thousand figurines of the last 246,000 delivered shall be reduced by $2.25 for each day elapsing between March 5, 1964, and date of delivery.
‘1 11. In the event that deliveries of any one of the three groups referred to in paragraph 9 are not completed within ten days after the deadline specified in paragraph 9 for delivery of that group, we shall be entitled to terminate the contract, in which event no further deliveries of figurines will be accepted, and title to the complete production molds shall in such event vest in us.”
Third-party defendant Spier, Beacon’s president, guaranteed in writing, “ unconditionally and absolutely that Beacon will well and faithfully perform and fulfill all of the terms and conditions therein required of Beacon, at the time and in the manner therein specified; provided, however, that my liability under this Guarantee shall in no event exceed in the aggregate the sum of $8,437.50 together with interest thereon.”
Beacon was consistently late in making deliveries. Delivery of the first 144,000 figurines, scheduled to be completed prior to *636 February 10, was made in installments but not completed until March 9. The same was true of the second 360,000 units, scheduled to be completed prior to February 26, which was not completed until March 24; and the third 246,000 units, scheduled to be completed prior to March 5, which was not completed until April 6. Applying the “ liquidated damage ” figure of $2.25 per day for each day of lateness of each installment provides the substantial portion of the damages of $33,836.43 alleged in the counterclaim.
On March 13 and 24, Corn Products wrote Beacon complaining of late deliveries and of defects in the figurines. It made “ additional deposit * * # without prejudice to the rights of either party ’ ’ under paragraphs 8 and 9 of the contract and provided that Corn Products should not be considered in default under the provision requiring payment to be made within one week after invoice ‘1 by reason of the fact that we have made no payments on your invoices.” Beacon agreed to the foregoing recitals and stipulations.
On April 3, the parties entered into a supplemental agreement. This increased the quantity of figurines from 750,000 to 975,000, the additional quantity to be billed at $42.50 per thousand. They were to be delivered no later than April 24. “ For the reasons specified in Paragraph 9 of the Contract, it is agreed that in lieu of liquidated damages for any lateness on your part on making deliveries of said additional 225,000 figurines, the purchase price for each 1,000 thereof shall be reduced by $2.25 for each day elapsed between April 24, 1964 and date of delivery.” Spier did not guarantee this supplemental contract.
On April 6,14, 24 and 30, Corn Products wrote Beacon letters similar to those of March 13 and 24, and Beacon similarly agreed to the stipulations. The supplemental 225,000 figurines were delivered late.
Defendant is entitled to summary judgment on its counterclaim on the issue of liability. In fact, plaintiff does not seriously contest its breach but takes issue with defendant’s claim for liquidated damages. Plaintiff’s excuses for late deliveries have no merit. First, it urges that the initial deposit of $8,437.50 was not mailed by defendant until January 3, 1964. But the contract was made after the close of business on December 31, 1963 and plaintiff did not insist on a check at that time. In any event, a delay of one or two days in mailing the deposit check would not excuse delays in delivery extending from 30 to 60 days.
Secondly, plaintiff wrote defendant on February 4 agreeing to make certain corrections in the ears, mouth area, and buttons *637 of the figurines in accordance with defendant’s request of the previous day.
The letter concluded: “In addition, we are to remove the letter ‘ R ’ which now appears in a circle alongside the word ‘ Bosco ’. So that completion of the mold will not be materially delayed, it was agreed that we would machine out the ‘ R ’, leaving the circle in the mold. We will be pleased to accomplish this modification at no additional cost to Corn Products Company. ’ ’
The conference of February 3 was held on the morning after the Saturday when plaintiff was scheduled to exhibit his final production sample. With the recitals of its lateness in the numerous letters from defendant previously referred to, these corrections would not justify the delays. Moreover, the letter to Beacon from its subcontractor indicates that these delays were the fault of Beacon. By acceptance of the late deliveries, defendant did not waive its right of damages. ‘ ‘ Though a buyer of a commodity may accept delivery of the commodity after the stipulated date, he may still retain his right of action for damages caused by. delay. (Pers. Prop. Law [Cons. Laws, ch. 4], § 130.) ” (Richard v. American Union Bank, 253 N. Y. 166,174.) This principle has been reiterated in section 2-714 of the Uniform Commercial Code. The buyer here has conformed to this requirement of notification embodied in subdivision (3) of section 2-607.
The remaining question is whether defendant is entitled to summary judgment for the liquidated damages sought in its counterclaim.
The rule governing the recovery of liquidated damages is aptly summarized in 5 Corbin, Contracts, as follows:
“ The courts recognize the uncertainty of the judicial process in estimating losses in terms of money and in awarding compensation. Experience has shown that there are many cases in which the award of a court or jury is no more likely to be exact compensation than is the advance estimate of the parties themselves. Further, the enforcement of such estimates saves the time of courts, juries, parties, and witnesses, and reduces the expense of litigation. In such cases, the enforcement of the express contract provision cannot be said to be in disregard of the principle of compensation.
‘1 In order to sustain a provision for payment of a definite sum as a liquidation of damages, it is necessary that at the time the contract is made it must appear that the injury that will be caused by breach will be difficult of estimation.” (§ 1060, pp. 348-350.)
*638 “ If a provision is held to be a genuine liquidation of damages and not for a penalty or forfeiture, it is enforceable according to its terms like any other valid contract promise or provision. It makes definite and certain the amount to be paid or retained. The injured party can get judgment for the specific amount promised, no more and no less. The function of the court and jury in estimating injury has been superseded. Evidence as to the existence and extent of injury may be admissible to aid the court in determining the character of the contract provision; but it is no longer relevant after the court has determined that the provision is a true liquidation and does not specify a penalty.” (§ 1061, p. 353.)
In the leading case of Cotheal v. Talmage (9 N. Y. 551) plaintiff entered into an agreement with a company of persons, of whom defendant was one, by which, in consideration of the sum of $100 paid to him by each of the individuals composing the company, he agreed to furnish them with a cabin passage to San Francisco, with subsistence for a year, and with the articles and tools necessary for carrying on mining operations in California. In return, the company severally covenanted with plaintiff that they would diligently devote themselves to obtaining gold and other precious metals, and a certain proportion of their earnings would be paid to plaintiff.
In upholding recovery of $500 stipulated as liquidated damages in the event of defendant’s breach, the court said, per Rtjggles, J. (pp. 553-555): “ The ablest judges have declared that they felt themselves embarrassed in ascertaining the principle on which the decisions upon questions like the present were founded. (2 Bos. & Pul., 350.) They have said, that the law relative to liquidated damages has always been in a state of great uncertainty; and that this has been occasioned by judges endeavoring to make better contracts for parties than they have made for themselves. * * * Where there is a contract to pay money, the damages for its breach are fixed and liquidated by law, and require no liquidation by the parties. An agreement to pay greater damages is, therefore, regarded as a penalty. But when the damages resulting from the breach are uncertain in amount, as they are in all other cases, the parties have the right to say how much shall be paid by way of compensation to the party injured; and when they have settled that compensation, neither a court of law, nor a court of equity, will diminish its amount unless it be so grossly disproportionate to the actual injury that a man would start at the bare mention of it. (2 Bos. & Pul, 351.) Where there is a manifest difficulty in ascertaining damages arising from the breach of the contract, and *639 the fair conclusion is that the amount is specified and agreed on for the purpose of saving the expense or avoiding the difficulty of proving the actual damages, the parties should be held to their bargain; and especially, where the amount fixed and liquidated is not far beyond what might probably be expected to arise from a breach of the contract.”
In Sun Print. & Pub. Assn. v. Moore (183 U. S. 642) plaintiff had hired a yacht from defendant. The charter party provided that the value of the yacht should be taken at the sum of $75,000. A judgment was entered for defendant for this amount as the damages resulting from destruction of the yacht, without allowing any deduction for the $10,000 paid to defendant on execution of the charter party. In affirming, the court (per White, J.) quoted with approval the following language from the opinion in Clement v. Cash (21 N. Y. 253, 257) (183 U. S. 673-674):‘ ‘ When the parties to a contract, in which the damages to be ascertained, growing out of a breach, are uncertain in amount, mutually agree that a certain sum shall be the damages, in case of a failure to perform, and in language plainly expressive of such agreement, I know of no sound principle or rule applicable to the construction of contracts, that will enable a court of law to say that they intended something else. Where the sum fixed is greatly disproportionate to the presumed actual damages, probably a court of equity may relieve; but a court of law has no right to erroneously construe the intention of the parties, when clearly expressed, in the endeavor to make better contracts for them than they have made for themselves. In these, as in all other cases, the courts are bound to ascertain and carry into effect the true intent of the parties. * * * When they declare, in distinct and unequivocal terms, that they have settled and ascertained the damages to be $500.00, or any other sum, to be paid by either party failing to perform, it seems absurd for a court to tell them that it has looked into the contract and reached the conclusion that no such thing was intended; but that the intention was to name the sum as a penalty to cover any damages that might be proved to have been sustained by a breach of the agreement.” (See, to the same effect, Bagley v. Peddie, 16 N. Y. 469, 475; Little v. Banks, 85 N. Y. 258, 266-267.)
Provisions for liquidated damages are generally upheld where the breach is of a covenant not to compete in connection with the sale of a business, since ‘ ‘ the value of the good will or patronage of the paper, as well as the amount of injury which the purchasers might sustain by any interference with it, were wholly uncertain and incapable of estimation otherwise than by *640 mere conjecture ” (Chancellor Walworth in Williams v. Dakin, 22 Wend. 201, 210 [Court for Correction of Errors]; italics in original). “ [I]n case of a breach of the agreement, it would be manifestly unjust for us to attempt to make a better or a different agreement for them than that which they intended to make for themselves; by compelling them to abandon the amount of damages which they had agreed upon in anticipation of the breach of the contract which has occurred, for the purpose of submitting the question of amount to the chance of what a jury might suppose was proper from hearing the conflicting opinions and vague conjectures of ignorant or prejudiced witnesses ” (ibid., pp. 213-214). (See, to the same effect, Hackenheimer v. Kurtzmann, 235 N. Y. 57, 66-67; Nobles v. Bates, 7 Cowen 307, 309; cf. Wirth & Hamid Fair Booking v. Wirth, 265 N. Y. 214, 223-225.)
But where it is apparent that the stipulation for “ liquidated damages ” is in effect a subterfuge for imposing a penalty the courts will not give effect to it.
Thus, in the early case of Dennis v. Cummins (3 Johns. Cas. 297) the parties had contracted to exchange lands, and in default of performance by either, the damages were fixed at $2,000. The court held that the actual damages should be assessed by a jury, saying (p. 298): “ If recurrence be had to this agreement, it never can be presumed that the parties had the sum in view, as the measure of damages, for the full value of the defendant’s property, which was to be exchanged, was only 3,750 dollars; and the value of the plaintiff’s considerably less. It would be a strange construction to suppose that the damages, on a failure in fulfilling such a bargain, should be 2,000 dollars. It is true, that where it is clearly inferrible, from the nature and terms of the contract, that the parties have estimated and liquidated the damages, and have inserted that sum, as the amount to be paid, in case of non-performance, the court would be bound so to consider it. The cases, however, in the books, (4 Burr. 2228. 2 Term Rep. 34,) where penalties have been considered in the nature of liquidated damages, are either where it appears from the contract that the penalties have barely exceeded the damages sustained, or where, from the nature and circumstances of the case, no rule for estimating the actual damages could be adopted, or it was manifestly the intention of the parties, that the sum inserted should be considered as a compensation, and not as a penalty.” (Italics in original.) (See, to the same effect, Spencer v. Tilden, 5 Cowen 144, 150. Cf. Slosson v. Beadle, 7 Johns. 72.)
*641 “ [W]here a contract contains a number of covenants of different degrees of importance and the loss resulting from the breach of some of them will be clearly disproportionate to the sum sought to be fixed as liquidated damages, especially where the loss in some cases is readily ascertainable, the sum so fixed will be treated as a penalty. The strength of a chain is that of its weakest link ” (Seidlitz v. Auerbach, 230 N. Y. 167, 173 [see explanation of this case by the author of its opinion in Hackenheimer v. Kurtzmann, supra [235 N. Y. 57, 66]; see, to the same effect, Lampman v. Cochran, 16 N. Y. 275, 277-278; Brownold v. Rodbell, 130 App. Div. 371, 374-377).
This entire subject of liquidated damages is discussed in comprehensive opinions by Bergan, J., in Callanan Road Improvement Co. v. Colonial Sand & Stone Co. (190 Misc. 418) and more recently by Wither, J., in Realworth Props. v. Bachler (33 Misc 2d 39), where they review the leading authorities.
In the former case, plaintiff was in the business of manufacturing crushed stone; defendant was in the cement and stone business and manufactured ready-mixed concrete in which crushed stone is an ingredient. Defendant there agreed to buy from plaintiff a minimum of 50,000 cubic yards of crushed stone at $1 a cubic yard plus transportation and taxes. The contract provided for liquidated damages of 15 cents a cubic yard for the part of the minimum quantity not taken. In awarding damages on that basis, the court said (pp. 422-423):
“ Plaintiff and defendant were in business where they dealt constantly with crushed stone. Their officers knew the subject matter. They were dealing with a specialized field and they were dealing with the future. I do not regard the existence of an open market at the time of the breach as having any necessary relation to the agreement made for damage in advance of a breach, unless the parties themselves make the market the criterion of damage.
‘ ‘ They were free to accept the future market, which they could not exactly foresee, or fix their own standard of damage. The validity of the agreement is to be tested as of the time when made. There was a ‘ market ’ for crushed stone in New York City at the time of the breach, but the proof here is, and I find, that the New York market in 1944 was so monopolized that plaintiff could not invade it except at great risk and expense and, as the record here shows from the attempts that were made, with great uncertainty.
‘ ‘ The parties fixed their own obligations with intelligence and with a knowledge both of the subject with which they dealt and what would be reasonable to expect as damage flowing from *642 a breach. I do not see any good reason for a court to try to improve on what they agreed to do; or any judicial ability to deal more sensibly with the subject; or any authority in the court to declare invalid what it was plainly their right to engage to do and which they undertook to set out plainly in writing.” (See, to the same effect, Kemp v. Knickerbocker Ice Co., 69 N. Y. 45, 57-59.)
In Realworth Props. v. Bachler (supra) a lessee deposited $110,000 as security for a 30-year lease of a multi-tenant building with annual rent of $140,800. The lessee took over the management of the building and its repair and maintenance and became chargeable with satisfying the occupying tenants; and the lessee relieved defendants of all responsibility for operating the building. In holding that defendants were entitled to retain the deposit because of lessee’s failure to keep the building in proper repair, the court said (33 Misc 2d 39, 48): “ If the lessee should fail to maintain the premises in good repair, fail to please the occupying tenants and keep the building well rented, and default in its lease, defendants had much to lose. They ran the risk of the lessee ‘ milking ’ the property, allowing it to run down, causing defendants to lose the benefits of their bargain, and requiring the defendants to return to the business of managing the building themselves, repairing the structure and regaining satisfactory and satisfied tenants. Such loss was incapable of exact pre-estimation, and in fact is still incapable of computation.”
(See, to the same effect, J. & H. Garage v. Flow Corp., 225 App. Div. 65 [per Finch, J.], affd. 251 N. Y. 553 [security treated as liquidated damage for breach of covenant to pay rent].) But in Caesar v. Rubinson (174 N. Y. 492) the security was treated as a penalty because the landlord’s damages were capable of accurate measurement.
Three cases come closest to the instant case on its facts, because they similarly involved delay in performance.
Ward v. Hudson Riv. Bldg. Co. (125 N. Y. 230, 235) allowed liquidated damages to a landowner for a contractor’s delay in erecting certain houses. Curtis v. Van Bergh (161 N. Y. 47, 52-54) allowed liquidated damages to a tenant for the landlord’s failure to deliver possession of factory premises on the stipulated date. Weinstein & Sons v. City of New York (264 App. Div. 398) denied liquidated damages to the Welfare Department for plaintiff’s delay in delivering dress woolens to a W. P. A. sewing project for manufacture into shirts for distribution to welfare recipients. The court said (p. 400): “ All the facts and surrounding circumstances herein indicate that *643 the so-called liquidated damages bore no reasonable relation to any probable or actual loss and that the clause in question provided for a penalty and not liquidated damages. The proof establishes that no claims were made against defendant and that defendant suffered no financial damage whatsoever. By its own action defendant impliedly admits the unreasonableness and excessiveness of its formula since it did not take the full percentage it claims it was authorized to take, but an arbitrary figure fixed by someone in the department of welfare on the basis of a telephone communication from the department of purchase. ’ ’
This indicates that liquidated damages may be allowed in an appropriate case. But they should await a trial and not be awarded on summary judgment unless the moving papers clearly establish the essential ingredients for sustaining the validity of a liquidated damage stipulation. As stated by Judge Gray in Ward v. Hudson Riv. Bldg. Co. (supra [125 N. Y.] p. 235): “ To get at that we must consider the subject matter and nature of the agreement and understand clearly the intention of the parties. If it shall then appear that the damage and loss, which may be presumed to result from non-performance, are uncertain and incapable of exact ascertainment, then the payment or liability fixed by them must be deemed to be liquidated damages and recoverable as such. Where, however, a sum has been ..stipulated as a payment by the defaulting party, which is disproportionate to the presumable or probable damage or to a readily ascertainable loss, the courts will treat it as a penalty and will relieve; on the principle that the precise sum was not of the essence of the agreement, but was in the nature of a security for performance.”
The fact that the counterclaim here is for practically the full amount of the purchase price would not defeat recovery if the liquidated damage provision meets the foregoing requirement. Thus, in Curtis v. Van Bergh (161 N. Y. 47, supra) the lessor agreed to complete a building by a certain date and to pay the lessee damages of $50 per day for each day’s delay in giving possession, as liquidated damages.
In upholding that provision, the court overruled the lessor’s contention (161 N. Y. 52) that if “ the rent reserved was but $5.75 per day, the sum of fifty dollars for each day’s delay is so out of proportion to the probable loss, as to bring the contract within that class of cases which hold that where the sum agreed to be paid is so great as to be unconscionable, it will be regarded as a penalty, even if the parties have expressly declared their intention to be otherwise.”
*644 But in that case, the lessee offered persuasive proof as to the elements of its damage, which led the court to the following conclusion (pp. 53-54):
“ Both parties knew that the failure to have the building ready on time would naturally result in the loss of business, and either in the temporary occupation of another building or a forcible removal through legal process. These elements of damage, which were necessarily within the contemplation of the parties, as reasonable men, when they made the contract, are uncertain, hard to ascertain with exactness and dependent upon extrinsic circumstances and considerations. Who can tell the loss to a large manufacturing business caused by closing the works in a busy season, by the removal of such a business to temporary quarters, or by summary dispossession at the hands of an officer ? Who can estimate the injury to a manufacturing plant under such circumstances ? What is more difficult to prove than loss of profits or damages to a business? What pecuniary standard is there to measure them by? (Little v. Banks, supra.) How can the amount be fixed, except by agreement? The damages, under the facts before us, are necessarily hard to establish with exactness, or otherwise, yet they máy be so serious as to render it desirable to have the amount agreed upon in advance. The parties themselves can 1 come to a more satisfactory conclusion as to the damages than would be possible for a jury.’ (Jones v. Binford, 74 Me. 445.) This is, therefore, one of those cases where it must be presumed that the parties stipulated for the payment of a fixed sum of money absolutely, ‘ from the difficulty of ascertaining any exact amount of damages which would be sustained by a breach of the agreement.’ (Chase v. Allen, 13 Gray, 42.)
“ Is the sum agreed upon out of all proportion to the probable loss, under the circumstances known to the parties when the agreement was made? Is it so disproportionate that one ‘ would start at the mere mention of it, ’ which is the test laid down in Cotheal v. Talmage (supra) ? Of course the parties did not contemplate a long delay in completing the building or neither of them would have entered into the contract at all. We cannot say, as matter of law, that fifty dollars a day for the absolute suspension of a prosperous manufacturing business, for a few days, at the busiest season of the year, accompanied by a temporary removal to other quarters, or a forcible removal to the street, is so excessive as to shock one’s sense of justice. It is less in proportion to the actual damages than the amounts sustained in several of the cases cited. Indeed, the *645 actual damages might exceed it and the covenant thus prove a protection to the one in default. ’ ’
Corn Products may be able to establish the existence of similar elements upon a trial and should be given the opportunity to do so. But I conclude that the affidavits on this motion fall short of the requirement.
It is not disputed that before making the contract Beacon was told that the figurines were designed for use in a television sales promotion which had to be conducted on a strict time schedule and that if it delayed deliveries, Corn Products would not be able to find another supplier or replace the contemplated promotion with a substitute. But an issue of fact is presented as to the effect which these delays had on the sales promotion and whether the liquidated damages are “disproportionate to the presumable or probable damage, or to a readily ascertainable loss ” (Ward, supra).
This is not a situation like Callanan (supra) where both seller and buyer knew the subject matter and “ fixed their own obligations with intelligence and with a knowledge both of the subject with which they dealt and what would be reasonable to expect as damage flowing from a breach.” The parties here were dealing with a prediction as to what impact a television program would have on sales of Bosco.
A trial can more appropriately develop whether the liquidated damages provided have met the requirements set forth above.
Order modified to the extent of granting defendant’s motion for summary judgment on its counterclaim against plaintiff and against third-party defendant and ordering an assessment of damages, and as so modified affirmed, without costs.
Hofstadter and Markowitz, JJ., concur.
Order modified, etc.