421 F.2d 53
 The STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY,
Plaintiff-Appellee-Appellant,
v.
S.T.G. CONSTRUCTION CO., Inc., and Continental Casualty
Company,Defendants-Appellants-Appellees.
 Nos. 214, 215 and 216, Dockets 33077, 33113 and 33188.
 United States Court of Appeals Second Circuit.
 Argued Nov. 6, 1969.
Decided Jan. 26, 1970.
 
 Donald M. Dunn, Donald B. Ferens, Alexander & Green, New York City, for plaintiff-appellee-appellant.
 Max E. Greenberg, Louis Cantor, New York City, for S.T.G. Construction Co.
 Donald B. Knight, New York City, for Continental Casualty Co.
 Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 S.T.G. Construction Company, the defendant below, together with its surety Continental Casualty Company, failed to complete a contract it had entered into with the plaintiff, Staten Island Rapid Transit Railway Company, to build a fender system for a new bridge being constructed by the Railroad over the Arthur Kill from Staten Island to Port Elizabeth, N.J. The Railroad commenced a diversity of citizenship action in the United States District Court for the Southern District of New York[1] by which it sought to recover in damages the additional sums it had to pay to the contractor who completed the work above and beyond the S.T.G. contract price, and also sought to recover liquidated damages for the delay in completion. S.T.G. in turn counterclaimed in quantum meruit for the work done before it abandoned the work, alleging that the Railroad and not S.T.G. had breached the contract by furnishing defective construction plans and specifications. The trial court entered judgment for the Railroad on the issue of breach, awarding it the additional costs of completion it proved, but denied its claim for liquidated damages. S.T.G.'s counterclaim was also denied. Both parties appeal. We affirm the judgment below.
 
 
 2
 The construction of the new bridge involved three separate contracts, of which this suit involves the third. Each contract was financed by the Railroad with federal aid under the Truman-Hobbs Act, 33 U.S.C. 511 et seq. Contract Number One provided for the construction of piers Numbers One and Two and the bridge approaches. Contract Number Two provided for erection of the superstructure of the new bridge and removal of the existing swing-span of the old bridge. Contract Number Three, which gave rise to this litigation, involved the demolition of the old bridge's center pier and abutments and of a wooden trestle; and the construction of a fender system for the new bridge's Pier Number One, on the Staten Island side of the Arthur Kill.
 
 
 3
 Contract Number Three was advertised for bids subject to the approval of the Army Corps of Engineers. Prospective bidders were furnished plans and specifications, core borings indicating subsurface conditions, and engineering drawings of the foundations of the pier which the fender system was to protect. S.T.G. submitted the lowest bid for Contract Number Three, at $833,140-- a price $56,000 less than the next lowest bid-- and was awarded the contract which was entered into on January 18, 1960.
 
 
 4
 Construction of the fender system involved the erection of eight interconnected circular cells, five on the north side and three on the south side of Pier Number One. These cells were to serve as a fender to protect the pier from being struck by ships or floating objects and were to be completed by September 28, 1960. The fender cells were to be constructed of sheet steel which would be filled with loose stone and sunk into the bed of the Kill. Four of the cells were to be driven to an elevation of 45 feet below the bed which would seat them 10 feet into solid bedrock. The contract anticipated that this seating would be accomplished by first sinking the cells as far as the bedrock, then draining them of water, and finally securing them in the rock by blasting out a trench into which the cells of sheet steel were to be placed.
 
 
 5
 S.T.G. satisfactorily and promptly completed the demolition work called for by Contract Number Three. However, after entering on the fender construction work, S.T.G. soon became convinced that the blasting method was unsafe because blasting might 'blow' the cells, thereby allowing water to rush into them, and because a blasting purposed to seat one cell might dislodge rock and earth which would strike and dislodge other cells from position. On February 26, 1960, soon after entry upon the contract, S.T.G. submitted a substitute plan which the Railroad approved. Under this plan, the construction company before sinking the cells to bedrock would drill a circle of holes in the rock where the cells were to be sunk, then would break down the rock between these holes with a spud to form a circular trench. These operations would be conducted 'in the wet,' that is, under water, before the cells were sunk to the level of the bedrock.
 
 
 6
 Very little was ever accomplished by S.T.G. under this plan. A well driller attempted in April, 1960, to drill the required holes but quickly decided that he was unable to do so. In July and August S.T.G. also attempted use of an auger drill, a churn drill, and a tractor drill, but these attempts also failed. The chief impediment was S.T.G.'s inability to keep the holes in the required alignment. At one point, in trying to break the web of rock between two holes which had been drilled, S.T.G. attempted to pound the sheet metal of a cell down into the rock with pile drivers, but this tactic only succeeded in buckling the steel. Moreover, some of the sheet metal parts of a cell were installed backwards. This prevented them from interlocking correctly and caused a loss of structural strength. Eventually, S.T.G. admitted its inability to complete the contract by the drilling method that it had, itself, suggested.
 
 
 7
 Although the contract should have been completed by September 28, 1960, S.T.G. negotiated to continue and complete the contract at no additional cost to the Railroad. In January 1961 S.T.G. suggested yet another method of construction, the so-called 'drilled-in-caisson' method. On February 16, 1961, the Railroad notified S.T.G. that it would accept this modification and offered to extend the completion date, but insisted that S.T.G. pay liquidated damages for the delay as had been provided in the original contract. S.T.G. rejected this condition, though it still offered to continue work. In June, 1961, the Railroad finally told S.T.G. to commence work within ten days or it would secure another contractor to finish the job. S.T.G. did not comply, and the Railroad finally contracted with another construction company to remove the damaged sheet pilings installed by S.T.G. and to finish the work at an additional cost of $100,843.50 over the original price of the contract with S.T.G. Of this sum $50,538 represented the cost of repairing the pilings already driven by S.T.G. which were damaged and out of interlock. The completed work was finally accepted by the Railroad and the Army Engineers on July 5, 1962.
 
 
 8
 On the basis of these facts, the trial court found that the original contract permitted S.T.G. to use any adequate method it desired to sink the cells into the rock and did not actually require it to use blasting. Consequently the court rejected S.T.G.'s argument that the Railroad had furnished it with defective plans requiring the use of unfeasible construction methods. Moreover, the court found that blasting was itself feasible with the use of a double cofferdam to protect the cells. The court also found that two other methods could have been used by S.T.G. to sink the pilings into the rock: the so-called 'glory-hole method' and the pre-drilling method which had been unsuccessfully attempted by S.T.G. The court therefore concluded that the plans furnished by the Railroad were not defective and that S.T.G. had attempted to perform a contract which was too demanding for its resources. Moreover, the court rejected S.T.G.'s argument that the Railroad's letter of February 16, 1961 waived the original contract completion date and that later, subsequent to this waiver, the Railroad attempted to modify this new agreement by reinstating the liquidated damages provision of the January 18, 1960 contract. The court found instead that no agreement at all was reached in February, 1961, so that, throughout, the original contract of January, 1960 remained in force and S.T.G. remained liable under it.
 
 
 9
 We find the district court's view of the case convincing. It is true that the contract apparently contemplated the use of blasting to sink the pilings,[2] but there is also evidence to indicate that the contract need not be read as requiring such a method.[3] Yet, even if the contract had required blasting 'in the dry,' the court found as a matter of fact that S.T.G. could have done so safely with the use of a double cofferdam, but also found that S.T.G. did not even attempt so to utilize blasting. This finding is supported adequately by the testimony of the plaintiff's expert witness.[4] Finally, even if blasting had not been practical, S.T.G. itself submitted and had approved as a modification of the contract, a drilling method which the court again found to be workable but which S.T.G. failed to carry out. For all these reasons we reject the argument that the Railroad breached the contract by supplying defective plans, and we hold that S.T.G. breached the contract by failing to perform it according to those plans.
 
 
 10
 We also agree with the district court that no new contract was formed in February, 1961, when the Railroad offered to extend the completion date of the contract but also insisted on payment of liquidated damages. The continuation of the provision providing for liquidated damages appears to have been an integral part of the Railroad's offer to modify the contract, and when S.T.G. rejected the condition it rejected the Railroad's extension-of-time offer as well.
 
 
 11
 S.T.G. also alleges that, even if it did breach the contract, the Railroad should not be permitted the recovery it seeks because the United States Government paid for five-sixths of the additional costs of completion beyond the original contract price, and the Railroad ultimately paid less as a result of S.T.G.'s breach than it would have paid had S.T.G. completed the contract.[5] We find this argument unpersuasive inasmuch as the Railroad must account to the Government for any recovery it obtains here. The Government's payment to the Railroad of additional costs the Railroad incurred in this case is authorized by 33 U.S.C. 517. Unless the Railroad suffers costs, it seems clear that no governmental payment to it would be authorized. If the Railroad recovers from S.T.G. or its surety in this suit, it will have suffered no excess costs, and its retention of government funds aimed at defraying excess costs would be illegal.[6]
 
 
 12
 We now turn to the Railroad's cross-appeal from the lower court's denial of the Railroad's claim for liquidated damages, which the contract had specified in the amount of $250 per day, or a total of $161,250 for the 645 day delay involved here. The lower court awarded a total of $36,416.04 as actual damages arising from the delay, a sum which compensated the extra time and expense of the Railroad's employees ($12,624.00) and its engineers ($13,182.00), and of the personnel and overhead charges of the Army Engineers ($10,610.04). The Railroad asserts that it reasonably foresaw sufficiently substantial but indefinite damages at the time the contract was entered into and therefore seeks to enforce the liquidated damages provision instead of accepting only the actual damages award made by the lower court. These additional damages, the Railroad asserts, consist of interference to navigation, wasted time of its engineers and other personnel beyond the amount recognized by the lower court, calculations of insurance premiums, and intangible delay in the dredging of the channel.
 
 
 13
 The court below found that the Railroad had not shown that it could have reasonably expected the delay in the completion to prevent it from using the bridge, and that it had not adequately shown the nature of the additional damages it claimed. As a result the court found the liquidated damages provision to be unrelated in amount to any possibly foreseeable real damages and hence to be a penalty provision, not allowable under New York law. We agree. The standard applicable under New York law in upholding or rejecting a liquidated damages provision in a contract is whether the provision constitutes a reasonable attempt to estimate damages which, though real, may be uncertain in amount. See, e.g., Realworth Properties, Inc. v. Bachler, 33 Misc.2d 39, 223 N.Y.S.2d 910 (Sup.Ct.1962), and cases cited therein at 917. In this case the Railroad has not shown that any real damages possibly and reasonably could have been foreseen that would solely result from a delay in the contract's completion, for it has not alleged with sufficient particularity the way in which it was injured by delay. Thus, the reality of its expected additional damages and not merely their amount is cast into doubt. It is unclear from the Railroad's brief whether it or the Government was affected by any substantial delay in the dredging of the channel or affected by any significant interference with navigation. The time of engineers and other personnel is mentioned only generally, and there is no showing to a greater extent than the lower court recognized that these persons were sitting by, idle but paid, because of the construction delay, during the period of the delay. Nor does the Railroad make any attempt to demonstrate the nature of its claimed increases in insurance premiums because of some unclear extension of liability which it was presumably required to insure for. The Railroad also fails to show that its use of the new bridge was delayed because of the late completion of the fender system.
 
 
 14
 The Railroad appears to argue that a failure on the part of S.T.G. to complete certain portions of its Contract Number Three which are not directly involved here-- portions requiring the demolition of the center pier of the old bridge being replaced, of the old abutments, and of a wooden trestle-- would in fact have delayed its use of the new bridge, and therefore that the liquidated damages provisions of the contract were reasonable provisions to have been inserted at the time the contract was entered into. However, we do not think that the dating of reasonableness from the formation of the contract, Frick Co. v. Rubel Corp., 62 F.2d 765, 768 (2 Cir. 1933), covers the situation at bar, where even at the time of the contract's formation it would not have been reasonable to expect that damages of $250 per day could possibly be suffered from a failure to complete the fender system, a portion of the contract which, if not timely performed, would not vitiate timely performance of more necessitous provisions in this and the other two contracts.
 
 
 15
 We affirm.
 
 
 
 [1]
 The finding of facts by the lower court raised doubts about the existence of diversity by stating that S.T.G. Construction Company, the defendant, had its principal place of business in New York. The plaintiff, Staten Island Rapid Transit Railway Co., was also a New York corporation. However, all attorneys in this case have stipulated that the lower court factually erred, and that S.T.G.'s principal place of business at all times relevant to this suit was in New Jersey rather than in New York, although the company did maintain a New York office for purposes of this contract
 
 
 [2]
 Section II, Article 4 of the contract provided that 'blasting shall be employed adjacent to the new Pier No. 1,' and that the contractor's plan 'shall include * * * spacing of blast holes and the method of delayed blasting * * *.'
 
 
 [3]
 Section IV, Article 5, entitled 'Construction Methods,' provided only that rock shall be excavated 'by an approved method' and that the work 'shall preferably be done in the dry,' requiring otherwise only that the sheet steel be driven to required elevations
 
 
 [4]
 Direct testimony of Dr. Philip C. Rutledge
 
 
 [5]
 S.T.G. asserts that the Government paid $715,495.00 to the Railroad upon an estimate of the value of the work done by S.T.G., although the Railroad had paid only $643,945.50. This disparity, S.T.G. claims, resulted in over-compensation of $59,028.34 by the Government to the Railroad, a larger sum than the Railroad's one sixth share of the additional costs generated by S.T.G.'s breach. Had S.T.G. completed its contract, the disparity between the Railroad's actual payments and the Government's estimate would not have had any significance
 
 
 [6]
 Moreover, it does not appear that the Government needed to be joined as a real party in interest under Rule 17(a) Fed.R.Civ.P. or as a person required to be joined under Rule 19
 Rule 17(a) provides that suit may be brought solely in his own name by a party 'in whose name a contract has been made for the benefit of another.' 33 U.S.C. 516, 517 make clear that alterations to bridges pursuant to the Truman-Hobbs Act are designed to benefit the public as well as the bridge owner, and that the Government's financial share in construction evidences such benefit. Consequently we believe that the Railroad is a party comprehended within the language quoted above.
 As to Rule 19, we note that the Government was not greatly biased by nonjoinder, for it could have intervened had it so desired in order to protect its interest. See Fed.R.Civ.P. 24; Fed.R.Civ.P. 19, Advisory Comm. Note, 39 F.R.D. 92 (1966); Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 365-366 (1967). The defendants in view of the outcome in this case will almost certainly not be subject to future litigation commenced by the Government arising from the S.T.G. default upon this contract. Complete relief is granted as between these parties in the absence of the Government. Finally, S.T.G. did not raise the Government's nonjoinder as a reason for dismissal of the suit below and suggests it in this court only by inference.